[No. 3534.]

## H. H. HARRIS v. THE STATE.

1. CONTINUANCE — PRACTICE.— In the sixth subdivision of article 560, Code of Procedure, it is provided that the truth of the allegations made in every application by a defendant for a continuance, and the merit and sufficiency of the ground relied upon, are addressed to the "sound discretion of the court." This implies that the action of the court upon the application, even when it is first presented, should not be an arbitrary determination of its merits and sufficiency by the trial court, but the result of a *sound* discretion, which, of course, in passing upon an application prior to the trial, cannot be affected by the evidence which is afterwards adduced at the trial forced upon the defendant by the refusal of the continuance. But when, after the trial and conviction of the defendant, the court is called by the motion for a new trial to reconsider the grounds assigned in the application for a continuance, the truth, materiality and sufficiency of its allegations are to be considered in connection with the evidence adduced at the trial, and are not to be considered as already predetermined by the refusal of the continuance anterior to the trial, nor to be disposed of by an arbitrary as distinguished from a *sound* discretion.

2. SAME — THEFT — KLEPTOMANIA — CUMULATIVE PROOF — NEW TRIAL — CASE STATED.— In a theft case the defense asked a continuance to obtain the attendance of two witnesses, who, it was alleged, would establish the fact that the defendant, at and prior to the taking of the property, was a kleptomaniac. The application set out the witnesses's opportunity of knowledge of the general fact, and their knowledge of specific facts establishing the general fact. Diligence to obtain the attendance of the witnesses was fully alleged and not controverted, but the application was overruled. At the trial the defense adduced other witnesses, whose testimony tended to establish the same general and particular facts, but which also showed that the said absent witnesses had the best opportunities to know and establish them. After conviction the defense moved for a new trial, and, as one cause in the motion, assigned the overruling of the application for a continuance. The motion for new trial was overruled, and now the State contends that the ruling was correct, because the testimony of the absent witnesses would have been merely cumulative. But *held* that in cases like the present the cumulative character of testimony does not impair its materiality, and in this case that of the absent witnesses would not have been merely cumulative, inasmuch as it appears that their opportunities for full knowledge of the facts were better than those of the witnesses at the trial; and, as the probable truth of the absent testimony is also apparent, the trial court erred in refusing a new trial in the case.

3. KLEPTOMANIA, which is an uncontrollable propensity to steal, is now a well recognized species of insanity, and, if clearly established by the evidence, constitutes a complete defense in a trial for theft.

4. SAME — EVIDENCE.— Expert or medical testimony is not the only species of proof competent to establish the defense of kleptomania. The opinion of a non-professional witness, based on his personal observation of the symptoms of kleptomania, is admissible as evidence in connection with his testimony to the symptomatic facts on which his opinion rests.

APPEAL from the District Court of Fort Bend.   Tried below before the Hon. W. H. Burkhart.

The indictment upon which the appellant in this case was convicted charged him with the theft of a horse, the property of A. F. Wheeler, in the county of Fort Bend, Texas, on the 16th day of July, 1883.   A term of seven years in the penitentiary was the penalty assessed by the jury.

A. F. Wheeler, the first witness for the State, testified that at the time of the alleged offense he resided on the plantation of Colonel Ellis, in Fort Bend county.   Between 8 and 9 o'clock on the night alleged in the indictment he put his horse in the stable.   He missed his horse early on the next morning, and observed when he missed him that he had eaten but little of his feed during the night.   Witness was a convict guard at that time.   Another of the convict guards missed his saddle and bridle, which were taken on the same night that witness's horse was taken.   The witness's horse was a sorrel animal, branded on the shoulder with the letters T E over a horizontal bar.

As soon as he missed his horse the witness had descriptive circulars printed, offering a reward of $50 for his recovery.   Mr. Lomax and witness addressed these circulars to various sheriffs throughout the State, and mailed them.   Within three weeks witness received a telegram from Mr. M. J. Baker, at Cuero, in De Witt county, informing him that he had the missing animal.   Witness went to Cuero and found his horse in the possession of the said M. J. Baker, to whom he paid the fifty-dollar reward, recovering his horse.   This horse was the property of the witness, and was taken without his knowledge or consent.   From Sugar Land, where the horse was taken, to Cuero, where he was recovered, the distance is about one hundred and seventy-five miles.   Witness was acquainted with the defendant, having known him for twelve or fourteen months prior to the theft of the horse.   During this time, and up to a few days before the theft, witness and defendant lived on the same place, and had been good friends, the defendant's occupation being that of a convict guard.   Defendant was living on the place when the witness went there; was familiar with the premises, and knew the witness's horse well.   Both witness and defendant worked under Mr. Robert Ransom.   Defendant was an unusually intelligent man, and had never, prior to this theft, so far as witness knew, been suspected of dishonest practices.   He acted as sergeant of the guard at one time.

Robert Ransom was the next witness for the State. He testified that he knew the defendant, and had known him for about eighteen months prior to the date of the alleged theft. During this time, until a few days before the theft of Wheeler's horse, he was in the employ of the witness. Defendant was perfectly familiar with the premises and knew Wheeler's horse well. This was the first crime witness ever heard imputed to the defendant. He owned and wore a suit of blue flannel clothes while in the witness's employ.

J. H. Barry was the next witness for the State. He testified that on the night of Tuesday, July 16, 1883, he left Houston on the Gulf, Harrisburg & San Antonio Railway, going west. The defendant was on that train, and rode with the witness until the train reached the water tank near Walker Station. Witness got off the train at Walker Station and saw no more of the defendant on that night after the train left the tank. The water tank described was about six hundred yards from where A. F. Wheeler lived at that time. Defendant may have left the train at the tank or he may have gone into another car. Witness was well acquainted with the defendant.

John Cummings testified, for the State, that, during the year 1883, he was in charge of the ferry across the Brazos river at Richmond. About 12 or 1 o'clock at night on or about July 16, 1883, he was awakened by a man to be put across the river. He told witness that he was going to Richmond to get a doctor for some of Mr. Ransom's folks. The man had on a blue flannel coat and was riding A. F. Wheeler's sorrel horse, which horse the witness knew well. The man kept the saddle while in the boat, with his back to the moon, which was shining brightly. He did not recross the river.

M. J. Baker was the next witness for the State. He testified that he resided in Cuero, De Witt county, Texas, and was engaged in the mercantile and livery business. On or about July 20, 1883, he saw the defendant in Cuero in possession of a sorrel horse branded T E, over a horizontal bar, which horse defendant offered to sell the witness. He told the witness that he had ridden the horse from the Clear creek neighborhood, *via* Hallettsville. A few days later witness saw Wheeler's circular, offering $50 reward for the horse, and telegraphed Wheeler to come for the animal. T. G. Peterson brought the horse to the witness's stable, and a few days afterwards Wheeler came to Cuero, paid the $50, and got the horse. The horse which witness turned over to Wheeler was the same horse which the defendant tried to sell the witness.

Robert Rail was the next witness for the State. He testified that

he lived near Cuero, in De Witt county, Texas.   On July 23, 1883, witness saw the defendant in Cuero, and purchased a sorrel horse from him for which he paid defendant $70, taking his bill of sale. E. Brumlet wrote the bill of sale, and defendant signed it in witness's presence.   The bill of sale reads as follows:

"Cuero, Texas, July 23, 1883.

"Know all men by these presents that I have this day sold to Robert Rehl, for a valuable consideration, one (1) sorrel horse,. seven years old, not quite fifteen hands high, and branded thus: (fac-simile of T E over a horizontal bar) on left shoulder.

"H. H. Harris."

"Witness: Ernest Brumlet."

A few days after this transaction Mr. T. G. Peterson, sheriff of De Witt county, came to witness's house, got the horse and took him away.   Witness had never recovered his money.

Alex. Olsen, for the State, testified that he lived in Cuero, Texas, and was the proprietor of a wagon yard and feed stable.   He saw the defendant in Cuero on Saturday evening, July 19, 1883.   He had with him the sorrel horse described by the witnesses heretofore examined.   He tried to sell this horse, which, he said, was raised by a butcher in Houston.   Defendant remained in Cuero until the following Tuesday or Wednesday, when he left for Victoria, on the train, taking a bridle and saddle with him.

Sheriff T. G. Peterson testified, for the State, that he saw the defendant in Cuero on or about July 20, 1883, in possession of the horse described, which horse defendant tried to sell to the witness. Defendant left Cuero on the Victoria train about July 23, 1883.   A few days afterwards, witness received the Wheeler circular elsewhere described.   Witness then went to Robert Rail's house, got the horse from that gentleman, and took him to Baker's stable in Cuero.   A few days later, Mr. Wheeler came ·to Cuero and got the horse. Within a week or two later Mr. Ernest Brumlet handed the witness the following letter:

"Victoria, July 26, 1883.

"Mr. Bob Rheal,. Cuero:

"Dear Sir:   My advice to you is to carry the sorrel horse off up the country somewhere.   He is good property, but was brought off from Clear creek to avoid trouble.   He was won on a horse race and the party would not give him up.   I will see you up about Conch or Coleman in a few weeks and explain all to you.

"Yours very truly,

"H. H. H."

Defendant told witness that he brought the horse from Oyster creek.

C. W. Parnell, deputy sheriff of Fort Bend county, testified that he received the custody of the defendant from the Robertson county jail. The State rested.

Robert Ransom testified, for the defense, that one W. J. Denson was a guard on the L. A. Ellis plantation in Fort Bend county, and was discharged about the time Wheeler's horse was stolen. Denson was a bad man, and witness thought all the time that he stole the Wheeler horse. Denson owned a good horse and rode him off when he was discharged. Witness saw the defendant about five days after the theft of the Wheeler horse. He stepped off the train at Sugar Land, and conversed with witness for some minutes. It was not uncommon at that time to see men with blue clothes. Witness himself, and others that he knew, owned blue coats.

Andrew Dow testified, for the defense, that he had known the defendant for a number of years. Witness was the manager of G. W. Butler's stock interests in the year 1873, during which year defendant was an employee of Butler, under witness. Defendant remained in Butler's employ until 1878. The defendant had a severe illness in the year 1875, and was not expected to recover. Previous to that illness he bore a most excellent character, and for that reason was intrusted with the most important of the ranch interests. His sickness changed him greatly in appearance and habits. From a most kind and affable companion and gentleman he changed into a remarkably morose, cross and captious person. So great was the change in this latter respect that whereas, before his sickness, he was intrusted with the care of the horses because of his humane treatment of them, he was deprived of their care afterwards because of his cruelty and abuse of them. It was then, too, that the other men began complaining to witness of the propensities to pilfer which had developed in the defendant. He would steal the men's combs, looking glasses, tobacco, ropes, and even bread, and secrete them under his mattress. This propensity to steal asserted itself in the defendant about one year after his sickness, and clung to him until he had to be discharged. Prior to his sickness the defendant was a prime favorite with all the attaches of the ranch.

G. W. Butler, for the defense, corroborated the witness Dow in every particular. He testified further that among the articles stolen by the defendant, while employed on his ranch, and for which he had no earthly use, was a pillow-case from the Girardin hotel in Galveston, which article he took while on a visit to Galveston with

witness.   After his discharge from the ranch, the witness, compassionating his apparent misfortune, took him home to live, but witness's wife shortly made complaint that he was stealing and secreting articles of little value and no use to him.   Defendant was a man of irreproachable honesty prior to his sickness, and belonged to a distinguished family in this State, the individual members of which stand high as men of probity and good character.   Witness not only paid defendant well, but gave him authorized credit in Houston and Galveston, and there was no time, while in witness's employ, that he could not have obtained without trouble or delay anything he wanted or needed.   Like the other men he was always provided with an abundance of tobacco, yet he would steal this article from his fellows and secrete it.   Joe White, one of the witnesses for whom a continuance was asked (see first head-note), was more intimate and familiar with the defendant and his malady than any other one of his associates.   The witness Dow, now a large merchant and alderman of the city of Houston, a man of high character, was manager of the witness's business during the defendant's service on the ranch.   Witness had known nothing about defendant since he left his employ in 1878.

E. T. Lewis corroborated the testimony of the witness Butler.

Isam Bundwick, colored, testified that he was in Mr. Butler's employ during the time the defendant was a hand on the ranch, and, as all of the other hands did, formed quite an attachment for him. Defendant was never the same man after his violent illness in 1875, but, from a scrupulously honest man, changed into a pilferer of articles of small value and of no use to him.   He stole one boot from the witness when he could as easily have stolen both, and also stole a cheap pocket comb.   He wore the one boot out on a western trip, and seemed much humiliated when the witness taxed him with taking it, and promised to pay witness for it, which he never did.

H. S. Mason testified that he kept hotel in Richmond, and that, when in that town, the defendant always stopped with him.   He stopped with him when this case was on trial at a former term of court, and when he left he stole Mr. P. P. Pearson's valise, leaving a trunk and several articles of small value at the hotel.

P. P. Pearson testified, for the defense, that he was absent from Richmond when the defendant stole his valise.   Witness had been of counsel for defendant from the time of his indictment.   He had studied this case from every point of view, and, believing honestly that the defendant was irresponsible for his action in taking the valise, made no complaint against him.

The motion for new trial complained of the charge of the court as given, of the action of the court in refusing instructions asked, of the organization of the jury, and of the sufficiency of the evidence to support the conviction, and also of the overruling of the application for a continuance.

*P. P. Pearson,* for the appellant, filed an admirable brief and argument.

*J. H. Burts,* Assistant Attorney-General, for the State:

WHITE, PRESIDING JUDGE. Whilst a continuance, even though the application be in every respect in strict conformity with the requisites of the statute, is no longer a matter of right, still the truth as well as merit of the matters or ground set forth "is addressed to the sound discretion of the court." (Code Crim. Proc., art. 560, subdiv. 6.) The action of the court should not be arbitrary in the first instance, but the result of "sound discretion." (*Miller* v. *The State, ante,* p. 232.)

Especially should this sound discretion be exercised when, after having overruled the application in the first instance, the court is called a second time to consider its materiality and truth in connection with all the evidence in the case, on the motion for a new trial. It rarely happens that the want of truth is positively or clearly, or even probably, apparent when first presented, and, if overruled upon that ground in the first instance, it cannot be stated as a reason that the other evidence shows it to be untrue; because the other evidence could not have been before the court when it acted upon the motion. That the evidence subsequently adduced shows or renders it probable that the proposed testimony is untrue can only be determined, in a majority of cases, on the motion for a new trial; and such a reason in such cases might be given by the court, in explanation to a bill of exceptions, for overruling the motion for new trial, in so far as the application for continuance was involved in said motion. Ordinarily, then, the truth of the proposed evidence is matter of sound discretion on the motion for a new trial. Still, in all cases the court, as far as practicable and with the lights before it, must, even as to *the truth,* exercise *a sound* as contradistinguished from a mere arbitrary discretion, in passing upon the application in the first instance.

Kleptomania was the only defense relied upon by the defendant. That kleptomania is a species of insanity which, if clearly established, will render its subject morally irresponsible for the crime of

theft is, it seems, now well settled. (1 Whart. & Stille's Med. Jur. (3d ed.), § 590; *Looney* v. *The State*, 10 Texas Ct. App., 520.)

And "whatever may have been the rules of evidence heretofore with regard to the proof admissible on the subject of insanity, the doctrine that non-professional witnesses should be allowed to state their opinion as to the sanity of the party, derived from their acquaintance with and observation of his conduct, appearance and actions, has become too well settled to admit of doubt or controversy at this time." (*Webb* v. *The State*, 5 Texas Ct. App., 596; citing *Holcomb* v. *The State*, 41 Texas, 125, and *McClackey* v. *The State*, 5 Texas Ct. App., 320.) In *Thomas* v. *The State*, 40 Texas, 60, it is said: "We think the witnesses should be allowed to give their opinions, together with the facts on which their opinions were based, where it appears that their acquaintance with the party will enable them to form correct opinions of his mental condition." (See, also, *Campbell* v. *The State*, 10 Texas Ct. App., 560.)

Kleptomania ordinarily is an abnormal condition which is produced by or results from disease, and "the abnormal tendency continues after the disease to all external appearance has ceased. This continuance shows, however, that mental disease, though latent, still exists." Kleptomania, it is said, will be found accompanied more or less by other incipient symptoms of derangement, such as a general alteration in the accustomed mode of feeling, thinking, occupation and life of the individual, a disposition to scold, dispute and quarrel, to drink, and to wander about busily doing nothing, and the bodily signs of excitement, restlessness, want of sleep," etc. (1 Whart. & Stille's Med. Jur., § 590; *Looney* v. *The State*, 10 Texas Ct. App., 520.)

Five witnesses for defendant testified positively to many facts and circumstances tending most strongly to show, by the acts and conduct of defendant after his recovery from a serious and protracted spell of sickness, that he had become a confirmed kleptomaniac. Most of the symptoms of the disease, as above stated, were testified to in his case, and his petty thefts and propensity to steal were notorious amongst those who knew and associated with him. Some of these witnesses testified that the absent witness White, for whom the continuance was sought, was more particularly intimate with, and had had better means of knowing his condition, and was better able to give an opinion as to his mental condition, than any one else. This witness White had been recognized at the time of the trial as a witness for defendant, and diligence is fully shown so far as he was concerned. His proposed testimony, as set out in the ap-

plication for continuance, is not only material, but probably true in the light of the other evidence. It cannot be said that the evidence was but cumulative. In such cases, or rather in this character of defense, the greater the number of witnesses testifying to the insanity of the accused, the more likely is the fact to become conclusively established. That the evidence would be but cumulative is no sufficient reason for its exclusion in such a case, nor is it a good ground for overruling an application for continuance otherwise sufficient. Under the facts in this case we are of opinion the court should have granted the continuance in the first instance, and we are clearly of opinion that the court should have granted the new trial, upon account of the proposed testimony of the absent witness, if for no other reason.

Several other supposed errors are complained of. Whether errors or not, their discussion is unnecessary, as they are of a character not likely to arise upon another trial. As to the charge of the court, the law was fairly and ably presented, and sufficiently covered the subject-matter of the special requested instructions.

For error in the ruling of the court with regard to the application for continuance, the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

[Opinion delivered May 23, 1885.]