[The following case, *Parsons v. The State*, was given the Reporter for publication when the printing of this volume was about completed; and consequently, could not be inserted among the criminal cases to be found in the first pages of this Report.]

# Parsons *v.* State.

### *Indictment for Murder.*

1. *Insanity as a defense; proper rule of legal responsibility.*—The capacity to distinguish between right and wrong, either abstractly or as applied to the particular act, as a legal *test* of responsibility for crime, is repudiated by the modern and more advanced authorities, legal and medical, who lay down the following rules which the court now adopts:

[Parsons v. State.]

(1), where there is no such capacity to distinguish between right and wrong as applied to the particular act, there is no legal responsibility; (2), where there is such capacity, a defendant is nevertheless not legally responsible, if, by reason of the *duress* of mental disease, he has so far lost the *power to choose* between right and wrong, as not to avoid doing the act in question, so that his free agency was at the time destroyed; *and*, at the same time, the alleged crime was so connected with such mental disease, in the relation of cause and effect, as to have been the product or offspring of it *solely*.

2. *Delusional insanity; the same rule.*—The same rule applies to delusional insanity, and necessarily conflicts with the old rule laid down by the English Judges, in *McNaghten's Case*, that, in cases of delusion, the defendant "must be considered in the same situation as to responsibility, as if the facts with respect to which the delusion exists were real." (The 4th head-note in *Boswell's Case*, 63 Ala. 308, on this point, pronounced *obiter dictum*.)

3. *Insanity as a disease; question for jury.*—The existence, or non-existence of the disease of insanity, such as may fall within the above rule, is a question of fact to be determined in each particular case by the jury, enlightened, if necessary, by the testimony of experts.

4. *Same; burden of proof; reasonable doubt.*—When insanity is set up as a defense in a criminal case, it must be established to the satisfaction of the jury by a preponderance of the evidence, and a reasonable doubt of the defendant's sanity, raised by all the evidence, does not justify an acquittal.

5. *Special venire; and service of copy on defendant.*—Under the provisions of the act approved February 17, 1885, regulating the drawing and summoning of jurors, (Acts Ala. 1884–85, pp. 181–87), the special *venire* for a capital case consists of the regular jurors for the week, and the additional jurors (not being less than twelve, nor more than twenty-four) drawn by the presiding judge in open court; and a copy of the names of these jurors being served on the defendant, it is no objection that some of them were not then summoned, or were not summoned at all.

6. *Non-experts as witnesses in insanity cases.*—The rule on this subject stated in *Ford's Case*, 71 Ala. 385, adhered to, that while non-experts may give their opinions on the question of the defendant's alleged insanity, such opinions must first be prefaced by a statement of the facts upon which it is based.

APPEAL from City Court of Birmingham.
Tried before the Hon. H. A. SHARPE.

The indictment in this case charged that the defendants, Nancy J. Parsons and Joe Parsons, unlawfully and with malice aforethought killed Bennett Parsons by shooting him with a gun.

When the said cause was called for trial, the defendants objected to being put upon trial, on the ground that a list of jurors *summoned* for their trial, had not been delivered to them. In support of the motion it was shown that defendants, since the indictment was found, had been confined in jail; that the list of names, delivered to them, setting forth the jurors summoned for their trial, was a list of the names of persons composing the panel of *thirty-six* jurors which had been regularly summoned for the week, together with the names of *twenty-four* special jurors drawn for this trial as provided by section 10 of the act approved Feb. 17, 1885, and for the summoning of

[Parsons v. State,]

whom an order had been issued, and all the persons embraced in said list of twenty-four had not, at the time of the service thereof on the defendants, been summoned, and no return had been made by the sheriff of said county, showing that such persons had been summoned for the trial of the defendants. It was further shown that subsequent to serving said list on defendants, the sheriff summoned most of the persons therein, but five were not summoned at all by the sheriff, the same being returned, not found ; that an entire day did not elapse between the said return of the sheriff, and the day appointed for defendants' trial. The court overruled defendants' objection, whereupon an exception was duly reserved.

On said trial the evidence, on behalf of the State, tended to show that the defendants, Joe Parsons and Nancy J. Parsons, murdered Bennett Parsons on Jan. 31, 1885, by shooting him with a gun.

The evidence on behalf of defendants tended to show that defendant, Joe Parsons, was, at the time of said killing, and had always been an idiot ; and that defendant, Nancy Parsons, was, at the time of said killing, insane ; that the act of Nancy, assisting in the killing of deceased, was the result of an insane delusion that deceased possessed supernatural power to inflict her with disease, and power by means of a supernatural trick, to take her life ; that deceased by means of such supernatural power had caused said Nancy to be sick and in bad health for a long time, and that her act at the time of said killing, in assisting therein, was under the insane delusion that she was in great danger of the loss of her life from deceased, to be effected by a supernatural trick. The defendant, Nancy, was the wife of deceased, and defendant, Joe, was his daughter. The evidence also tended to show insanity for two generations in the families of said defendants.

The defendant, Joe, offered to prove by Mrs. James Nail, that, " she had known Joe Parsons from her infancy, that she has been idiotic all her life, and she is idiotic now, and that she has seen her frequently during her acquaintance with her, and has often conversed with her." The State objected to the introduction of said evidence, which objection the court sustained, and defendants excepted.

The court, *ex mero motu*, charged the jury that, " When insanity is relied on as a defense to crime, and such insanity consists of a delusion merely, and the defendant is not shown to be otherwise insane, then such delusion is no justification or excuse of homicide unless the perpetrator was insanely deluded into the belief of the existence of a fact or state of facts which, if true, would justify or excuse the homicide under

[Parsons v. State.]

the law applicable to sane persons." The defendants duly excepted to the giving of this charge.

The court gave the following, among other charges, at the request of the State, to which defendants duly excepted :

" 2. It is only insanity of a chronic or permanent nature which, on being proved, is presumed to continue; there is no presumption that fitful and exceptional attacks of insanity are continuous."

" 5. If the jury believe from all the testimony that the defendants at the time of the killing were in such a state of mind as to know that the act they were committing was unlawful and morally wrong, they are responsible as a sane person, if the jury believe they committed the act with which they are charged."

The defendants asked the following charges, in writing, which the court refused to give, and to which rulings of the court exceptions were duly reserved.

" 6. In order to constitute a crime the accused must have memory and intelligence sufficient to know that the act she is about to commit is wrong, to remember and understand that if she commits the act she will be punished, and besides this, reason and will to enable her to comprehend and choose between the supposed advantage at the gratification to be obtained by the criminal act and the immunity from punishment which she will secure from abstaining from it."

" 8. If the jury believe from the evidence that the prisoners or either of them was moved to action by an insane impulse controlling their will or their judgment, then they are, or the one so affected, is, not guilty of the crime charged."

" 12. If the jury believe from the evidence that the prisoners committed the act in a manner which would be criminal and unlawful, if they were sane, the verdict should be " not guilty," if the killing was an offspring or product of mental disease in the prisoner.

The jury, on their retirement, found the defendants guilty of murder in the second degree, and this appeal is prosecuted from the judgment rendered on such finding.

SMITH & LOWE, and WM. BETHEA, for appellants.

T. N. McCLELLAN, Attorney-General, contra.

SOMERVILLE, J.—In this case the defendants have been convicted of the murder of Bennett Parsons, by shooting him with a gun, one of the defendants being the wife and the other the daughter of the deceased. The defense set up in the trial was the plea of insanity, the evidence tending to show that the

[Parsons v. State.]

daughter was an idiot, and the mother and wife a lunatic, subject to insane delusions, and that the killing on her part was the offspring and product of those delusions.

The rulings of the court raise some questions of no less difficulty than of interest, for, as observed by a distinguished American judge, " of all medico-legal questions, those connected with insanity are the most difficult and perplexing." Per DILLON, C. J., in *State v. Felter*, 35 Iowa, 67. It has become of late a matter of comment among intelligent men, including the most advanced thinkers in the medical and legal professions, that the deliverances of the law courts on this branch of our jurisprudence have not heretofore been at all satisfactory, either in the soundness of their theories, or in their practical application. The earliest English decisions, striving to establish rules and tests on the subject, including alike the legal rules of criminal and civil responsibility, and the supposed tests of the existence of the disease of insanity itself, are now admitted to have been deplorably erroneous, and, to say nothing of their vacillating character, have long since been abandoned. The views of the ablest of the old text writers and sages of the law were equally confused and uncertain in the treatment of these subjects, and they are now entirely exploded. Time was in the history of our laws that the veriest lunatic was debarred from pleading his providential affliction as a defense to his contracts. It was said, in justification of so absurd a rule, that no one could be permitted to stultify himself by pleading his own disability. So great a jurist as Lord Coke, in his attempted classification of madmen, laid down the legal rule of criminal responsibility to be that one should " *wholly* have lost his memory and understanding ;" as to which Mr. Erskine, when defending Hadfield for shooting the King, in the year 1800, justly observed : " No such madman ever existed in the world." After this great and historical case, the existence of delusion promised for a while to become the sole test of insanity, and acting under the duress of such delusion was recognized in effect as the legal rule of responsibility. Lord Kenyon, after ordering a verdict of acquittal in that case, declared with emphasis that there was " no doubt on earth " the law was correctly stated in the argument of counsel. But, as it was soon discovered that insanity often existed without delusions, as well as delusions without insanity, this view was also abandoned. Lord Hale had before declared that the rule of responsibility was measured by the mental capacity possessed by a child fourteen years of age, and Mr. Justice Tracy, and other judges, had ventured to decide that, to be non-punishable for alleged acts of crime, " a man must be totally deprived of his understanding and memory, so as not

[Parsons v. State.]

to know what he was doing—no more than an infant, a brute, or *a wild beast.*"—*Arnold's case*, 16 How. St. Tr. 764. All these rules have necessarily been discarded in modern times in the light of the new scientific knowledge acquired by a more thorough study of the disease of insanity. In *Bellingham's Case*, decided in 1812, by Lord Mansfield at the Old Bailey, (Coll. on Lun. 630), the test was held to consist in a knowledge that murder, the crime there committed, was "against the laws of God and nature," thus meaning an ability to distinguish between right and wrong in the abstract. This rule was not adhered to, but seems to have been modified so as to make the test rather a knowledge of right and wrong as applied to the particular act.—Lawson on Insanity, 231, § 7 *et seq.* The great leading case on this subject in England, is *McNaghten's case*, decided in 1843 before the English House of Lords, 10 Cl. & F. 200 ; s. c., 2 Lawson's Cr. Def. 150. It was decided by the judges in that case, that, in order to entitle the accused to acquittal, it must be clearly proved that, at the time of committing the offense, he was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did, not to know that what he was doing was wrong. This rule is commonly supposed to have heretofore been adopted by this court, and has been followed by the general current of American adjudications.—*Boswell v. The State*, 63 Ala. 307 ; s. c., 35 Amer. Rep. 20 ; s. c., 2 Lawson's Cr. Def. 352 ; *McAllister v. State*, 17 Ala 434 ; Lawson on Insanity, 219–221, 231.

In view of these conflicting decisions, and of the new light thrown on the disease of insanity by the discoveries of modern psychological medicine, the courts of the country may well hesitate before blindly following in the unsteady footsteps found upon the old sandstones of our common law jurisprudence a century ago. The trial court, with prudent propriety, followed the previous decisions of this court, the correctness of which, as to this subject, we are now requested to review.

We do not hesitate to say that we re-open the discussion of this subject with no little reluctance, having long hesitated to disturb our past decisions on this branch of the law. Nothing could induce us to do so except an imperious sense of duty, which has been excited by a protracted investigation and study, impressing our minds with the conviction that the law of insanity as declared by the courts on many points, and especially the rule of criminal accountability, and the assumed tests of disease, to that extent which confers legal irresponsibility, have not kept pace with the progress of thought and discovery, in the present advanced stages of medical science. Though science has led the way, the courts of England have declined

[Parsons v. State.]

to follow, as shown by their adherence to the rulings in *Mc-Naghten's case*, emphasized by the strange declaration made by the Lord Chancellor of England, in the House of Lords, on so late a day as March 11, 1862, that " the introduction of medical opinions and medical theories into this subject has proceded upon *the vicious principle of considering insanity as a disease?*"

It is not surprising that this state of affairs has elicited from a learned law writer, who treats of this subject, the humiliating declaration, that, under the influence of these ancient theories, " the memorials of our jurisprudence are written all over with cases in which those who are now understood to have been insane, have been executed as criminals."—1 Bish. Cr. Law (7th Ed.), § 390.   There is good reason, both for this fact, and for the existence of unsatisfactory rules on this subject.   In what we say we do not intend to give countenance to acquittals of criminals, frequent examples of which have been witnessed in modern times, based on the doctrine of moral or emotional insanity, unconnected with mental disease, which is. not yet sufficiently supported by psychology, or recognized by law as an excuse for crime.—*Boswell's case, supra;* 1 Whar. Cr. Law, (9th Ed.), § 43.

In ancient times, lunatics were not regarded as " unfortunate sufferers from disease, but rather as subjects of .demoniacal possession, or as self-made victims of evil passions."   They were not cared for humanely in asylums and hospitals, but were incarcerated in jails, punished with chains and. stripes, and often sentenced to death by burning or the gibbet.   When put on their trial, the issue before the court then was not as now.   If acquitted, they could only be turned loose on the community to repeat their crimes without molestation or restraint.   They could not be committed to hospitals, as at the present day, to be kept in custody, cared for by medical attention, and often cured.   It was not until the beginning of the present century that the progress of christian civilization asserted itself by the exposure of the then existing barbarities, and that the outcry of philanthropists succeeded in eliciting an investigation of the British Parliament looking to their suppression. · Up to that period the medical treatment of the insane is known to have been conducted upon a basis of ignorance, inhumanity, and empiricism.—Amer. Cyclop., Vol 9 (1874), *title*, INSANITY.   Being punished for wickedness, rather than treated for disease, this is not surprising.   The exposure of these evils not only led to the establishment of that most beneficient of modern civilized charities—the Hospital and Asylum for the Insane—but also furnished hitherto unequalled opportunities to the medical profession of investigating and treating insanity on the pathological basis of its being a disease

[Parsons v. State.]

of the mind. Under these new and more favorable conditions the medical jurisprudence of insanity has assumed an entirely new phase. The nature and exciting causes of the disease have been thoroughly studied and more fully comprehended. The result is that the "right and wrong test," as it is sometimes called, which, it must be remembered, itself originated with the medical profession, in the mere dawn of the scientific knowledge of insanity, has been condemned by the great current of modern medical authorities, who believe it to be "founded on an ignorant and imperfect view of the disease." Encyc. Brit. Vol. 15, (9th Ed.), title, INSANITY.

The question then presented seems to be, whether an old rule of legal responsibility shall be adhered to, based on theories of physicians promulgated a hundred years ago, which refuse to recognise any evidence of insanity, except the single test of mental capacity to distinguish right and wrong—or whether the courts will recognize as a possible fact, if capable of proof by clear and satisfactory testimony, the doctrine, now alleged by those of the medical profession who have made insanity a special subject of investigation, that the old test is wrong, and that there is no single test by which the existence of the disease, to that degree which exempts from punishment, can in every case be infallibly detected. The inquiry must not be unduly obstructed by the doctrine of *stare decisis*, for the life of the common law system and the hope of its permanency consist largely in its power of adaptation to new scientific discoveries, and the requirements of an ever advancing civilization. There is inherent in it the vital principle of juridical evolution, which preserves itself by a constant struggle for approximation to the highest practical wisdom. It is not like the laws of the Medes and Persians, which could not be changed. In establishing any new rule, we should strive, however, to have proper regard for two opposite aspects of the subject, lest, in the words of Lord Hale, "on one side, there be a kind of inhumanity towards the defects of human nature; or, on the other, too great indulgence to great crimes."

It is everywhere admitted, and as to this there can be no doubt, that an idiot, lunatic, or other person of diseased mind, who is afflicted to such extent as not to know whether he is doing right or wrong, is not punishable for any act which he may do while in that state.

Can the courts justly say, however, that the only test or rule of responsibility in criminal cases is the power to distinguish right from wrong, whether in the abstract, or as applied to the particular case? Or may there not be insane persons, of a diseased brain, who, while capable of perceiving the difference between right and wrong, are, as matter of fact, so far under

[Parsons v. State.]

*the duress of such disease* as to destroy *the power to choose* between right and wrong? | Will the courts assume as a fact, not to be rebutted by any amount of evidence, or any new discoveries of medical science, that there is, and can be no such state of the mind as that described by a writer on psychological medicine, as one "in which the reason has lost its empire over the passions, and the actions by which they are manifested, to such a decree that the individual can neither repress the former, nor abstain from the latter?"—Dean's Med. Jur. 497.

Much confusion can be avoided in the discussion of this subject by separating the duty of the jury from that of the court in the trial of a case of this character. The province of the jury is to determine facts, that of the court to state the law. The rule in *McNaghten's case* arrogates to the court, in legal effect, the right to assert, as matter of law, the following propositions:

(1). That there is but a single test of the existence of that degree of insanity, such as confers irresponsibility for crime.

(2). That there does not exist any case of such insanity in which that single test—the capacity to distinguish right from wrong—does not appear.

(3). That all other evidences of alleged insanity, supposed by physicians and experts, to indicate a destruction of the freedom of the human will, and the irresistible duress of one's actions, do not destroy his mental capacity to entertain a criminal intent.

The whole difficulty, as justly said by the Supreme Judicial Court of New Hampshire, is, that "courts have undertaken to declare that to be law which is *matter of fact.*" "If," observes the same court, "the tests of insanity are matters of law, the practice of allowing experts to testify what they are should be discontinued; if they are matters of fact, the judge should no longer testify without being sworn as a witness, and showing himself to be qualified to testify as an expert."—*State v. Pike,* 49 N. H. 399. |

We first consider what is *the proper legal rule of responsibility in criminal cases.*

No one can deny that there must be two constituent elements of legal responsibility in the commission of every crime, and no rule can be just and reasonable which fails to recognize either of them: (1). Capacity of intellectual discrimination; and (2). Freedom of will. Mr. Wharton, after recognizing this fundamental and obvious principle, observes: "If there be either incapacity to distinguish between right and wrong as to the particular act, or delusion as to the act, or inability to refrain from doing the act, there is no responsibility."—1 Whar. Cr. Law. (9th ed.), § 33. Says Mr. Bishop, in discussing this

[Parsons v. State.]

subject : "There can not be, and there is not, in any locality, or age, a law punishing men for what they can not avoid."—1 Bish. Cr. Law (7th ed.), § 383*b*.

If therefore, it be true, as matter of fact, that the disease of insanity can, in its action on the human brain through a shattered nervous organization, or in any other mode, so affect the mind as to subvert the freedom of the will, and thereby destroy the power of the victim *to choose* between the right and wrong, although he perceive it—by which we mean the power of volition to adhere in action to the right and abstain from the wrong—is such a one criminally responsible for an act done under the influence of such controlling disease? We clearly think not, and such, we believe to be the just, reasonable, and humane rule, towards which all the modern authorities in this country, legislation in England, and the laws of other civilized countries of the world, are gradually, but surely tending, as we shall further on attempt more fully to show.

We next consider the question as to the *probable existence of such a disease*, and the *test of its presence* in a given case.

It will not do for the courts to dogmatically deny the possible existence of such *a disease*, or its pathological and psychical effects, because this is a matter of evidence, not of law, or judicial cognizance. Its existence, and effect on the mind and conduct of the patient, is a question of fact to be proved, just as much as the possible existence of cholera or yellow fever formerly was before these diseases became the subjects of common knowledge, or the effects of delirium from fever, or intoxication from opium and alcoholic stimulants would be. The courts could, with just as much propriety, years ago, have denied the existence of the Copernican system of the universe, the efficacy of steam and electricity as a motive power, or the possibility of communication in a few moments between the continents of Europe and America by the magnetic telegraph, or that of the instantaneous transmission of the human voice from one distant city to another by the use of the telephone. These are scientific facts, first discovered by experts before becoming matters of common knowledge. So, in like manner, must be every other unknown scientific fact in whatever profession or department of knowledge. The existence of such a cerebral disease, as that which we have described, is earnestly alleged by the superintendents of insane hospitals, and other experts, who constantly have experimental dealings with the insane, and they are permitted every day to so testify before juries. The truth of their testimony—or what is the same thing, the existence or non-existence of such a disease of the mind—in each particular case, is necessarily a matter for the determination of the jury from the evidence.

[Parsons v. State.]

So it is equally obvious that the courts, can not, upon any sound principle, undertake to say what are the invariable or infallible tests of such disease. The attempt has been repeatedly made, and has proved a confessed failure in practice. "Such a test," says Mr. Bishop, "has never been found, not because those who have searched for it have not been able and diligent, but because it does not exist."—1 Bish. Cr. Law (7th ed.), § 381. In this conclusion, Dr. Ray, in his learned work on the Medical Jurisprudence of Insanity, fully concurs. Ray's Med. Jur. Ins. p. 39. (The symptoms and causes of insanity are so variable, and its pathology so complex, that no two cases may be just alike. "The fact of its existence," says Dr. Ray, "is never established by any single diagnostic symptom, but by the whole body of symptoms, no particular one of which is present in every case."—Ray's Med. Jur. of Ins. § 24. Its exciting causes being moral, psychical, and physical, are the especial subjects of specialists' study. What effect may be exerted on the given patient by age, sex, occupation, the seasons, personal surroundings, hereditary transmission, and other causes, is the subject of evidence based on investigation, diagnosis, observation, and experiment. Peculiar opportunities, never before enjoyed in the history of our race, are offered in the present age for the ascertainment of these facts, by the establishment of asylums for the custody and treatment of the insane, which Christian benevolence and statesmanship have substituted for jails and gibbets. The testimony of these experts—differ as they may in many doubtful cases—would seem to be the best which can be obtained, however unsatisfactory it may be in some respects.

In the present state of our law, under the rule in *McNaghten's case*, we are confronted with this practical difficulty, which itself demonstrates the defects of the rule. The courts in effect charge the juries, as matter of law, that no such mental disease exists, as that often testified to by medical writers, superintendents of insane hospitals, and other experts—that there can be as matter of scientific fact no cerebral defect, congenital or acquired, which destroys the patient's power of self-control—his liberty of will and action—provided only he retains a mental consciousness of right and wrong. The experts are immediately put under oath, and tell the juries just the contrary, as matter of evidence ; asserting that no one of ordinary intelligence can spend an hour in the wards of an insane asylum without discovering such cases, and in fact that "the whole management of such asylums presupposes a knowledge of right and wrong on the part of their inmates."—Guy & F. on Forensic Med. 220. The result in practice, we repeat, is, that the courts charge one way, and the jury, following an alleged high-

[Parsons v. State.]

er law of humanity, find another, in harmony with the evidence.

In Bucknill on Criminal Lunacy, p. 59, it is asserted as "the result of observation and experience, that in all lunatics, and in the most degraded idiots, whenever manifestations of any mental action can be educed, the feeling of right and wrong may be proved to exist."

"With regard to this test", says Dr. Russell Reynolds, in his work on "The Scientific value of the Legal Tests of Insanity," p. 34 (London, 1872), I may say, and most emphatically, that it is utterly untrustworthy, because untrue to the obvious facts of Nature."

In the learned treatise of Drs. Bucknill and Tuke on "Psychological Medicine", p. 269 (4th ed. London, 1879), the legal tests of responsibility are discussed, and the adherence of the courts to the right and wrong test is deplored as unfortunate, the true principle being stated to be "whether, in consequence of congenital defect or acquired disease, *the power of self-control* is absent altogether, or is so far wanting as to render the individual irresponsible." It is observed by the authors : "As has again and again been shown, the unconsciousness of right and wrong is one thing, and the powerlessness through cerebral defect or disease to do right is another. To confound them in an asylum would have the effect of transferring a considerable number of the inmates thence to the treadmill or the gallows."

Dr. Peter Bryce, Superintendent of the Alabama Insane Hospital for more than a quarter century past, alluding to the moral and diciplinary treatment to which the insane inmates are subjected, observes : "They are dealt with in this institution, as far as it is practicable to do so, as rational beings ; and it seldom happens that we meet with an insane person who can not be made to discern, to some feeble extent, his duties to himself and others, and his true relations to society." Sixteenth Annual Rep. Ala. Insane Hosp. (1876), p. 22 ; Biennial Rep. (1886), pp. 12–18.

Other distinguished writers on the medical jurisprudence of insanity have expressed like views, with comparative unanimity. And no where do we find the rule more emphatically condemned than by those who have the practical care and treatment of the insane in the various lunatic asylums of every civilized country. A notable instance is found in the following resolution unanimously passed at the annual meeting of the British Association of medical officers of Asylums and Hospitals for the Insane, held in London, July 14, 1864, where there were present fifty-four medical officers :

"*Resolved*, That so much of the legal test of the mental

condition of an alleged criminal lunatic as renders him a responsible agent, because he knows the difference between right and wrong, is inconsistent with the fact, well known to every member of this meetiug, that the power of distinguishing between right and wrong exists very frequently in those who are undoubtedly insane, and is often associated with dangerous and uncontrollable delusions." Judicial Aspects of Ins. (Ordronaux, 1877), 423–424.

These testimonials as to a scientific fact are recognized by intelligent men in the affairs of every day business, and are constantly acted on by juries. They can not be silently ignored by judges. Whether established or not, there is certainly respectable evidence tending to establish it, and this is all the courts can require.

Nor are the modern law writers silent in their disapproval of the alleged test under discussion. It meets with the criticism or condemnation of the most respectable and advanced in thought among them, the tendency being to incorporate in the legal rule of responsibility "not only *the knowledge* of good and evil, but the *power to choose* the one, and refrain from the other." Browne's Med. Jur. of Insanity, §§ 13 et seq., § 18; Ray's Med. Jur, §§ 16–19; Whart. & Stilles' Med. Jur. § 59; 1 Whart. Cr. Law (9th ed.), §§ 33, 43, 45; 1 Bish. Cr. Law (7th ed.), § 386 et seq ; Judicial Aspects of Insanity (Ordronaux), 419; 1 Green. Ev. § 372; 1 Steph. Hist. Cr. Law, § 168; Amer. Law Rev. Vol. 4 (1869–70), 236 et seq.

The following practicable suggestion is made in the able treatise of Balfour Browne above alluded to: "In a case of alleged insanity, then," he says, "if the individual suffering from enfeeblement of intellect, delusion, or any other form of mental aberration, was looked upon as, to the extent of this delusion, under the influence of duress (the dire duress of disease), and in so far *incapacitated to choose* the good and eschew the evil, in so far, it seems to us" he continues, "would the requirements of the law be fulfilled ; and in that way it would afford an opening, by the evidence of experts, for the proof of the amount of self-duress in each individual case, *and thus alone can the criterion of law and the criterion of the inductive science of medical psychology be made to coincide.*" Med. Jur. of Ins. (Browne), § 18.

This, in our judgment, is the practical solution of the difficulty before us, as it preserves to the courts and the juries, respectively, a harmonious field for the full assertion of their time honored functions.

So great, it may be added, are the embarrassments growing out of the old rule, as expounded by the judges in the House of English Lords, that, in March, 1874, a bill was brought

[Parsons v. State.]

before the House of Commons, supposed to have been drafted by the learned counsel for the Queen, Mr. Fitzjames Stephen, which introduced into the old rule the new element of an absence of the power of self-control, produced by diseases affecting the mind, and this proposed alteration of the law was cordially recommended by the late Chief Justice Cockburn, his only objection being that the principle was proposed to be limited to the case of homicide.—1 Whart. Cr. Law (9th ed.), § 45, p. 66, *note* 1; Browne's Med. Jur. of Insan. § 10, *note* 1.

There are many well considered cases which support these views.

In the famous case of *Hadfield*, 27 How. St. Tr. 1282, s. c. 2 Lawson's Cr. Def. 201–215, who was indicted and tried for shooting the King, and who was defended by Mr. Erskine in an argument most able and eloquent, it clearly appeared that the accused understood the difference between right and wrong as applied to the particular act: Yet he labored under the delusion that he had constant intercourse with the Divine Creator; that the world was coming to an end, and that, like Christ, he must be sacrificed for its salvation. He was so much under the duress of the delusion that he "must be destroyed, but ought not to destroy himself," that he committed the act for the specific purpose of being arrested and executed. He was acquitted on being tried before Lord Kenyon, and, no one ever doubted, justly so.

The case of *United States v. Lawrence*, 4 Cr. C. C. Rep. 518, tried in 1835, presented another instance of delusion, the prisoner supposing himself to be the King of England and of the United States as an appendage of England, and that General Jackson, then President, stood in his way in the enjoyment of the right. Acting under the duress of this delusion, the accused assaulted the President by attempting to shoot him with a pistol. He was, in five minutes, acquitted by the jury on the ground of insanity.

The case of the *United States v. Guiteau*, 10 Fed. Rep. 161, s. c. 2 Lawson's Cr. Def., 162, is still fresh in cotemporary recollection, and a mention of it can scarcely be omitted in the discussion of the subject of insanity. The accused was tried, sentenced, and executed for the assassination of James A. Garfield, then President of the United States, which occurred in July, 1881. The accused himself testified that he was impelled to commit the act of killing by inspiration from the Almighty, in order, as he declared, "to unite the two factions of the Republican party, and thereby save the government from going into the hands of the ex-rebels and their Northern allies." There was evidence of various symptoms of

mental unsoundness, and some evidence tending to prove such an alleged delusion, but there was also evidence to the contrary, strongly supported by the most distinguished experts, and looking to the conclusion, that the accused entertained no such delusion, but that, being a very eccentric and immoral man, he acted from moral obliquity, the morbid love of notoriety, and with the expressed hope that the faction of the Republican party, in whose interest he professed to act, would intervene to protect him.    The case was tried before the United States District Court, for the District of Columbia, before Mr. Justice Cox, whose charge to the jury is replete with interest and learning.    While he adopted the right and wrong test of insanity, he yet recognized the principle, that, if the accused in fact entertained an insane delusion, which was the product of the disease of insanity, and not of a malicious heart and vicious nature, and acted solely under the influence of such delusion, he could not be charged with entertaining a criminal intent.    An insane delusion was defined to be "an unreasoning and incorrigible belief in the existence of facts, which are either impossible absolutely, or impossible under the circumstances of the individual," and no doubt the case was largely determined by the application of this definition by the jury.    It must ever be a mere matter of speculation what influence may have been exerted upon them by the high personal and political significance of the deceased, as the Chief Magistrate of the Government, or other peculiar surroundings of a partisan nature.    The case in its facts is so peculiar as scarcely to serve the purpose of a useful precedent in the future.

We note other adjudged cases, in this country, which support the modern rule for which we here contend, including one decided in England as far back as 1840, often referred to by the text writers.    In *Rex v. Oxford*, 2 C. & P. 225, Lord Denman clearly had in mind this principle, when, after observing that one may commit a crime and not be responsible, he used this significant language: " If some *controlling disease* was in truth *the acting power within him*, which *he could not resist*, then he will not be responsible." The accused in that case acted under the duress of a delusion of an insane character.

In *State v. Felter*, 35 Iowa, 68, the capacity to distinguish between right and wrong was held not to be a safe test of criminal responsibility in all cases, and it was accordingly decided, that, if a person commit a homicide, knowing it to be wrong, but do so under the influence of an uncontrollable and irresistible impulse, arising not from natural passion, but from an insane condition of the mind, he is not criminally

responsible. "If," said Chief Justice Dillon, "by the observation and concurrent testimony of medical men who make the study of insanity a specialty, it shall be definitely established to be true, that there is an unsound condition of the mind, that is, a diseased condition of the mind, in which, though a person abstractly knows that a given act is wrong, he is yet, by an *insane impulse*, that is, an impulse proceeding from a diseased intellect, irresistibly driven to commit it—the law must modify its ancient doctrines and recognize the truth, and give to this condition, when it is satisfactorily shown to exist, its exculpatory effect."

In *Hopps v. People*, 31 Ill. 385, which was an indictment for murder, the same rule was recognized in different words. It was there held, that if, at the time of the killing, the defendant was not of sound mind, but affected with insanity, and such disease was the *efficient cause* of the act, operating to create an uncontrollable impulse so as to deprive the accused of the power of volition in the matter, and he would not have done the act but for the existence of such condition of mind, he ought to be acquitted.

In *Bradley v. State*, 31 Ind. 492, a like modification of the old rule was announced, the court observing: "Men, under the influence of disease, may know the right, and yet be powerless to resist the wrong. The well known exhibition of cunning by persons admitted to be insane, in the perpetration of an illegal act, would seem to indicate comprehension of its evil nature and legal consequences, and yet the power of self-control being lost from disease, there can be no legal responsibility."

In *Harris v. State*, 18 Tex. Ct. App. 287, s. c. 5 Amer. Cr. Rep. (Gibbons), 357, this rule was applied to the disease known as kleptomania, which was defined as a species of insanity producing an uncontrollable propensity to steal, and it was held, if clearly established by the evidence, to constitute a complete defense in a trial for theft.

*The State v. Pike*, 49 N. H. 399, was an indictment for murder, to which the plea of insanity was set up as a defense. It was held to be a question of fact for the jury to determine; (1), whether there was such a mental disease as dipsomania, which is an irresistible craving for alcoholic liquors, and (2), whether the act of killing was the product of such disease. One of the most instructive discussions on the law of insanity, which can be found in legal literature, is the learned opinion of Mr. Justice Doe in that case.—Lawson on Insanity, p. 311–312; 2 Lawson's Cr. Def. 311 *et seq.*

This ruling was followed by the same court in *State v. Jones*, 50 N. H. 369, s. c., 9 Amer. Rep. 242, which was an indict-

[Parsons v. State.]

ment charging the defendant with murdering his wife. The evidence tended to show that the defendant was insane, and killed her under the delusive belief that she had been guilty of adultery with one French. The rule in *McNaghten's case*, was entirely repudiated, both on the subject of the right and wrong test, and that of delusions, and it was held that the defendant should be acquitted if he was at the time afflicted with a disease of the mind of such character as to take away the capacity to entertain a criminal intent, and that there could be no criminal intent imputed, if, as matter of fact, the evidence showed that the killing was the offspring or product of such disease.

Numerous other cases could be cited bearing on this particular phase of the law, and supporting the above views with more or less clearness of statement. That some of these cases adopt the extreme view, and recognize moral insanity as a defense to crime, and others adopt a measure of proof for the establishment of insanity more liberal to the defendant than our own rule, can neither lessen their weight as authority, nor destroy the force of their logic. Many of them go further on each of these points than this court has done, and are, therefore, stronger authorities than they would otherwise be in support of our views.—*Kriel v. Com.* 5 Bush. (Ky.), 362; *Smith v. Com.* 1 Duv. (Ky.), 224; *Dejarnette v. Com.*, 75 Va. 867; *Coyle v. Com.*, 100 Penn. St. 573; *Cunningham v. State*, 56 Miss. 269; *Com. v. Rogers*, 7 Metc. 500; *State v. Johnson*, 40 Conn. 136; *Anderson v. State*, 43 Conn. 514, 525; Buswell on Ins. § 439 *et seq.*; *State v. McWhorter*, 46 Iowa 88.

The law of Scotland is in accord with the English law on this subject, as might well be expected. The criminal Code of Germany, however, contains the following provision, which is said to have been the formulated result of a very able discussion both by the physicians and lawyers of that country. "There is no criminal act when the actor at the time of the offense is in a state of unconsciousness, or morbid disturbance of the mind, *through which the free determination of his will is excluded.*"—Encyc. Brit. (9th ed.), Vol. 9, p. 112; citing Crim. Code of Germany (§ 51, R. G. B.)

The Code of France provides: "There can be no crime or offense if the accused was in a state of *madness* at the time of the act." For some time the French tribunals were inclined to interpret this law in such a manner as to follow in substance the law of England. But that construction has been abandoned, and the modern view of the medical profession is now adopted in that country.

It is no satisfactory objection to say that the rule above an-
38

[Parsons v. State.]

nounced by us is of difficult application. The rule in *McNagh-ten's case, supra*, is equally obnoxious to a like criticism. The difficulty does not lie in the rule, but is inherent in the subject of insanity itself.   The practical trouble is for the courts to determine in what particular cases the party on trial is to be transferred from the category of sane to that of insane criminals—where, in other words, the border line of punishability is adjudged to be passed.   But, as has been said in reference to an every day fact of nature, no one can say where twilight ends or begins, but there is ample distinction nevertheless between *day* and *night*.   We think we can safely rely in this matter upon the intelligence of our juries, guided by the testimony of men who have practically made a study of the disease of insanity ; and enlightened by a conscientious desire, on the one hand, to enforce the criminal laws of the land, and on the other, not to deal harshly with any unfortunate victim of a diseased mind, acting without the light of reason, or the power of volition.

Several rulings of the court, including especially the one given *ex mero motu*, and the one numbered five, were in conflict with this view, and for these errors the judgment must be reversed. The charges requested by defendant were all objectionable on various grounds.   Some of them were imperfect statements of the rules above announced ; some were argumentative, and others were misleading by reason of ignoring one or more of the essentials of criminal irresponsibility, as explained in the foregoing opinion.

It is almost needless to add that where one does not act under the duress of a diseased mind, or insane delusion, but from motives of anger, revenge or other passion, he can not claim to be shielded from punishment for crime on the ground of insanity. Insanity proper, is more or less a mental derangement, coexisting often, it is true, with a disturbance of the emotions, affections and other moral powers.   A mere moral, or emotional insanity, so-called, unconnected with disease of the mind, or irresistible impulse resulting from mere moral obliquity, or wicked propensities and habits, is not recognized as a defense to crime in our courts.—1 Whar. Cr. Law (9th ed.), § 46; *Boswell v. State*, 63 Ala. 307, 35 Amer. Rep. 20; *Ford v. State*, 71 Ala. 385.

The charges refused by the court raise the question as to how far one acting under the influence of an insane delusion is to be exempted from criminal accountability.   The evidence tended to show that one of the defendants, Mrs. Nancy J. Parsons, acted under the influence of an insane delusion that the deceased, whom she assisted in killing, possessed supernatural power to afflict her with disease and to take her life by

[Parsons v. State.]

some "supernatural trick;" that by means of such power the deceased had caused defendant to be in bad health for a long time, and that she acted under the belief that she was in great danger of the loss of her life from the conduct of deceased operating by means of such supernatural power.

The rule in *McNaghten's case*, as decided by the English judges, and supposed to have been adopted by the court, is that the defense of insane delusion can be allowed to prevail in a criminal case only when the imaginary state of facts would, if real, justify or excuse the act; or, in the language of the English judges themselves, the defendant " must be considered in the same situation as to responsibility, as if the facts with respect to which the delusion exists were real."—*Boswell's case*, 63 Ala. 307. It is apparent, from what we have said, that this rule can not be correct as applied to all cases of this nature, even limiting it as done by the English judges to cases where one "labors under partial delusion, and is not in other respects insane."—*McNaghten's case*, 10 Cl. & P. 200; s. c., 2 Lawson's Cr. Def. 150. It holds a partially insane person as responsible as if he were entirely sane, and it ignores the possibility of crime being committed under the duress of an insane delusion, operating upon a human mind, the integrity of which is destroyed or impaired by disease, except, perhaps, in cases where the imaginary state of facts, if real, would excuse or justify the act done under their influence.—Fields' Med. Leg. Guide, 101–104; Guy & F. on Forensic Med. 220. If the rule declared by the English judges be correct, it necessarily follows that the only possible instance of excusable homicide in cases of delusional insanity would be, where the delusion, if real, would have been such as to create, in the mind of a reasonable man, a just apprehension of imminent peril to life or limb. The personal fear, or timid cowardice of the insane man, although created by disease acting through a prostrated nervous organization, would not excuse undue precipitation of action on his part. Nothing would justify assailing his supposed adversary except an overt act, or demonstration on the part of the latter, such as, if the imaginary facts were real, would under like circumstances, have justified a man perfectly sane in shooting or killing. If he dare fail to reason, on the supposed facts embodied in the delusion, as perfectly as a sane man could do on a like state of realities, he receives no mercy at the hands of the law. It exacts of him the last pound of flesh. It would follow also, under this rule, that the partially insane man, afflicted with delusions, would no more be excusable than a sane man would be, if, perchance, it was by his fault the difficulty was provoked, whether by word or deed; or, if, in fine, he may have been so negligent

[Parsons v. State.]

as not to have declined combat when he could do so safely, without increasing his peril of life or limb. If this has been the law heretofore, it is time it should be so no longer. It is not only opposed to the known facts of modern medical science, but it is a hard and unjust rule to be applied to the unfortunate and providential victims of disease. It seems to be little less than inhumane, and its strict enforcement would probably transfer a large per centage of the inmates of our Insane Hospital from that institution to hard labor in the mines, or the penitentiary. Its fallacy consists in the assumption that no other phase of delusion, proceeding from a diseased brain, can so destroy the volition of an insane person as to render him powerless to do what he knows to be right, or to avoid doing what he may know to be wrong. This inquiry, as we have said, and here repeat, is a question of fact for the determination of the jury in each particular case. It is not a matter of law to be decided by the courts. We think it sufficient if the insane delusion—by which we mean the delusion proceeding from a *diseased mind*—sincerely exists at the time of committing the alleged crime, and the defendant believing it to be real, is so influenced by it as either to render him incapable of perceiving the true nature and quality of the act done, by reason of the depravation of the reasoning faculty, or so subverts his will as to destroy his free agency by rendering him powerless to resist by reason of *the duress of the disease*. In such a case, in other words, there must exist either one of two conditions: (1). Such mental defect as to render the defendant unable to distinguish between right and and wrong in relation to the particular act; or (2), the overmastering of defendant's will in consequence of the insane delusion under the influence of which he acts, produced by disease of the mind or brain.—*Rex v. Hadfield*, 37 How. St. Tr. 1282, s. c., 2 Lawson's Cr. Def. 201; *Roberts v. State*, 3 Ga. 310; *Com. v. Rogers*, 7 Metc. 500; *State v. Windsor*, 5 Harr. 512; Buswell on Insan. §§ 434 and 440; Amer. Law Review, Vol. 4 (1869–70) pp. 236–252.

In conclusion of this branch of the subject, that we may not be misunderstood, we think it follows very clearly from what we have said, that the inquiries to be submitted to the jury then, in every criminal trial where the defense of insanity is interposed, are these:

1. Was the defendant at the time of the commission of the alleged crime, as matter of fact, afflicted with a *disease of the mind*, so as to be either idiotic, or otherwise insane?

2. If such be the case, did he know right from wrong as applied to the particular act in question? If he did not have such knowledge, he is not legally responsible.

[Parsons v. State.]

3. If he did have such knowledge, he may nevertheless not be legally responsible if the two following conditions concur:

(1.) If, by reason of the duress of such mental disease, he had so far lost the *power to choose* between the right and wrong, and to avoid doing the act in question, as that his free agency was at the time destroyed.

(2.) And if, at the same time, the alleged crime was so connected with such mental disease, in the relation of cause and effect, as to have been the product of it *solely*.

The rule announced in *Boswell's case*, 63 Ala. 308, *supra*, as stated in the fourth head note, is in conflict with the foregoing conclusions, and to that extent is declared incorrect, and is not supported by the opinion in that case otherwise than by *dictum*.

We adhere, however, to the rule declared by this court in *Boswell's case, supra*, and followed in *Ford's case*, 71 Ala. 385, holding, that when insanity is set up as a defense in a criminal case, it must be established to the satisfaction of the jury, by a preponderance of the evidence; and a reasonable doubt of the defendant's sanity, raised by all the evidence, does not authorize an acquittal

There was no error in overruling the objection taken by the defendants to the copy of the venire, or list of jurors, served on them. The act approved February 17, 1885, (Acts 1884–85, pp. 181, 185, Sec. 10), regulating the organization of juries, applies to this case, and provides that "the names of the jurors *so drawn*." in accordance with section 10 of the act, together with the panel, of thirty-six jurors provided for by section 9, "shall constitute *the venire*," from which the jurors to try capital cases shall be selected.—Acts 1884–85, pp. 185–186. The rule on this subject declared in *Posey's case*, 73 Ala. 490, and *Shelton's case, Ib.* 5, has no application under this act. These cases construe section 4872 of the Code, which contains different language from the law here construed.

Under the rule announced in *Ford v. State*, 71 Ala. 385, 397, and authorities there cited, there was no error in excluding the proposed statement of Mrs. Nail. This testimony was defective in not being preceded more fully by the facts and circumstances upon which the opinion of the witness as to the sanity of the accused was predicated, the witness not being an expert.—Rogers on Expert Test. § 61.

The other rulings of the court need not be considered by us.

The judgment is reversed and the cause remanded. In the meanwhile the prisoners will be held in custody until discharged by due process of law.

STONE, C. J., dissents, in part, and expresses his views in the following opinion:

STONE, C. J., dissenting.—In *Boswell v. State*, 63 Ala. 307, two material questions arose, on the subject of insanity: First, whether or not when that defense is set up, its existence must be proved by the accused, what measure of proof is required to establish it, and whether it is enough if the testimony raises a reasonable doubt of the prisoner's sanity. We held it was defensive in its nature, and that the proof did not come up to the required standard, if it simply raised a reasonable doubt of its existence. As to the measure of proof, we applied the rule which obtains in civil cases, viz: That which reasonably satisfies the mind of a jury of the fact sought to be established.

The second question presented and considered in that case was, whether moral insanity was an excuse for an act otherwise punishable. We declared it was not; and in the category we included homicidal mania, irresistable impulse, and every other species of simply moral obliquity, provided the mental faculties were not shown to be unsound. Each of these principles was reaffirmed in *Ford v. State*, 71 Ala. 385.

The most important inquiry in *Boswell's case*—the one chiefly relied on for reversal—was the first stated above; the *onus* and measure of proof. The testimony scarcely raised any other. Our own decisions had left that question in deplorable uncertainty, as we attempted to show. The English authorities, particularly the older ones, had given way to a more enlightened understanding of mental disorders. It was on that question, namely, the presumption of sanity, and the burden and manner of overcoming that presumption, that the opinion of the judges in the *McNaghten Case*, was quoted and relied on. All the judges except Maule had concurred in advising the House of Lords "that every man is to be presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary is proved to their (the jury's) satisfaction." To this extent, the advice of the judges was pertinent to *Boswell's Case*, and for this purpose it was used. Beyond this the cases were unlike. McNaghten's mental malady was presented to the judges as one of "mental delusion." Their answers were given on the postulate that his mental disease was "partial delusion only," and that he was not "in other respects insane." Hence we said in *Boswell's Case:* "It must not be overlooked, that the judges were considering a case of partial insanity; the case of a person afflicted with insane delusion in respect to one or more particular subjects or persons." On the other hand, in *Boswell's Case*, there was no pretense of mental delusion.

[Parsons v. State.]

What we said on that question was simply a statement and citation of authorities, supporting and following the views of the judges, given in the McNaghten case. Its correctness or incorrectness was not material to a correct solution of the questions we were discussing; and while the principle was quoted without dissent, there was nothing to cause us to inquire into or question its correctness. Our attention was not directed to the tests of criminal accountability, except to that phase of it which is classed as moral insanity; and which we explicitly declared was no defense to a prosecution for crime. I do not feel committed, by anything said in *Boswell's Case*, to any proposition beyond the two principles stated above.

I summarize my views of the questions I propose to discuss, in the following brief paragraphs:

1. Insanity, when relied on as a defense to a prosecution for crime, ✓ is a mixed question of law and fact.

2. It is a perfect defense to an accusation of crime, if the accused, at the time. he committed the act, was afflicted with a mental disease to such extent, as to render him incapable of determining between right and wrong, or of perceiving the true nature and quality of the act done.

3. When it is satisfactorily shown that the accused was mentally diseased at the time he did the act, charged as an offense, and that he -- Durham did the act in consequence solely of such mental disease, without which it would not have been done. this is a complete defense, even though the defendant knew the act was wrong.

4. When at the time of committing the act charged, the defendant was laboring under a disease of the mind, known as delusion, illusion, or hallucination, and the act done was solely the result of such mental disease, connected with and growing out of it as effect follows cause, and without which the act would not have been done, the defendant should be acquitted on the plea of insanity.—Whar Cr. Ev. § 336; 2 Greenl. Ev. § 372.

5. No form of moral or emotional insanity is a defense against a criminal accusation.

· I have considered the very able opinion of my brother SOMERVILLE with great care, and I differ from what I understand to be its declared principles only to a limited extent, to be commented upon further on. I have also read the legal authorities he relies on, but have not read, on this subject, the other authorities he refers to. Some of them, I fear, deal too much in the abstruse and metaphysical—refine too much—to become safe guides in judicial administration. Legal principles, when enunciated for the government of juries, should, if possible, be expressed so simply and clearly, as to be easily understood by the class of men who generally perform that service. Less than this is not properly instructing juries on questions of law, pertinent to the issues they are sworn to try.

I differ with my brother Somerville in the interpretation of some of the legal authorities he relies on as supporting his views, and, as to others, in the estimate he places upon them as authority. This court has repudiated the doctrine of moral insanity as a defense for conduct otherwise criminal; and we hold that insanity is a defense to be affirmatively established by proof. It is not enough that a reasonable doubt of sanity is engendered.—*Boswell's Case*, 63 Ala. 307; *Ford's Case*, 71 Ala. 385. Of the judicial authorities relied on by him, the following cases hold that the defense of insanity is made good, if the testimony raises a reasonable doubt of its existence. Some of them go so far as to hold that when any evidence of insanity is produced, the burden is then cast on the prosecution to establish sanity beyond a reasonable doubt.—*State v. Jones*, 50 N. H. 369; *Bradley v. State*, 31 Ind. 492; *Hopps v. People*, 31 Ill. 385; *Cunningham v. State*, 56 Miss. 269; *State v. Johnson*, 40 Conn. 136.

In the opinion of my brother Somerville, the case of Felter, 25 Iowa, 68, is given a prominent place. The opinion in that case was prepared by the justly distinguished law writer and jurist, Chief Justice Dillon. The decision was in 1868. In considering the weight of that opinion, I remark, first, that it was pronounced by a court which holds that moral insanity is a defense to a criminal prosecution. Many of the expressions found in that opinion, and in the opinions of other courts entertaining similar views, are well chosen to express moral insanity and its workings. They are misleading, if not inappropriate, when used in description of intellectual unsoundness, or mental insanity. The defense relied on in that case was homicidal mania, the existence of which as mental disease, C. J. Dillon says, "both medicine and law now recognize." Yet in that case, the distinguished judge said: "If this want of power of control arose from the insane condition of the mind of the accused, he should not be held responsible. But if want of power to control his actions arose from violent and ungovernable passions, in a mind not diseased or unsound, he would and ought to be punished for his acts." In *McWhorter's Case*, 46 Iowa, 88, decided in 1877, the following charge had been requested in behalf of the prisoner: "If the jury believe from the evidence that, at the time of the commission of the alleged homicide, the defendant was laboring under a diseased condition of the mind, that he was insane on the subject of the manner in which the deceased (a physician) had treated his wife, and on the subject of deceased, with others, having formed a conspiracy to take his (defendant's) life, then the jury should acquit the defendant." This charge the

trial court had refused to give. The Supreme Court, in reference to it said : "It will be at once observed that this instruction fails to present the condition, that the mental disease must have destroyed the power of defendant to comprehend, rationally, the nature and consequences of his act and overpowered his will, which must exist in order to render him free from accountability for his acts." Felter's case is cited in support of this principle. In the still later case, *State v. Hockett*, 30 N. W. 742, the Supreme Court of Iowa expressed the principle as follows : "On the trial of an indictment for murder, where insanity is pleaded, an instruction to the jury that "the alleged insanity and the alleged crime must be connected, the one with the other, and the latter be the offspring of the former, in order to have the effect of rightfully declaring one irresponsible for his acts," is correct, where there is no evidence tending to show that the defendant was insane on all subjects, or was homicidally insane."

The case of *Hopps v. People*, 31 Ill. 385, is the next case relied on. The opinion in that case was by Judge Breese. The alleged insanity was in the form of mental illusion, as to his wife's infidelity to him. Speaking for the court, Judge Breese said : "We have come to the conclusion that a safe and reasonable test, in all such cases, would be, that whenever it shall appear from the evidence that, at the time of doing the act charged, the prisoner was not of sound mind, but affected with insanity, and such affection was the efficient cause of the act, and that he would not have done the act but for that affection, he ought to be acquitted. But this unsoundness of mind, or affection of insanity, must be of such a degree as to create an uncontrollabe impulse to do the act charged, by overruling the reason and judgment, and obliterating the sense of right and wrong as to the particular act done, and depriving the accused of the power of chosing between them." Let it be borne in mind that this summation of the principle was the utterance of a court which held that moral insanity precluded criminal accountability ; and yet, to make the defense available, it was held necessary that the mental unsoundness should have so far progressed, as to "obliterate the sense of right and wrong as to the particular act done."

That I am correct in my interpretation of the court's decision, I refer to the ruling of the same court made in *Dunn v. People*, 109 Ill. 635—decided in 1884. In that case the trial court had charged the jury, as follows : "If you believe from the evidence, beyond a reasonable doubt, that at the time of committing the alleged act the defendant was able

to distinguish right from wrong, then you can not acquit
him on the ground of insanity." Two other charges were
given, embodying the same thought, but expressed more in
detail. In the opinion of the court is this language : " It
is claimed that these instructions conflict with the law as
declared in *Hopps v. People*, 31 Ill. 385, and *Chase v. People*,
40 *ib.* 353. We do not so understand the instructions. In
the Hopps case, in discussing the question of insanity it
said," etc. The court then proceeds to repeat that part of the
opinion which I have copied above. It was added : " If
at the time the crime was committed the defendant knew
that it was wrong to commit such a crime, and had the
power of mind to choose either to do or not to do that act,
and of controlling his conduct in accordance with such
choice, then he ought to be held responsible, although he
was not entirely and perfectly sane.    .    .    Where a man
knows that it is wrong to do a certain act, and possesses
the power of mind to do or not to do that act, it would be a
dangerous doctrine to hold that such person should not be
held responsible, because he might not be regarded entirely
and perfectly sane."

The case of *Bradley v. State*, 31 Ind. 492, comes next in
order. The opinion in that case, which was pronounced in
1869, shows that the writer had read considerably on the
subject of mental disorders. Viewed from the standpoint
that, like the cases we have cited, that opinion was delivered
by a court which holds that moral insanity is a defense to a
criminal charge, and that if a reasonable doubt of sanity
is engendered, an acquittal must follow, there is nothing
remarkable in that case, except that it expresses disappro-
bation of the simply right and wrong test.

In *Walker v. State*, 102 Ind. 502, decided in 1885, the
Supreme Court of that State again considered the question
of insanity as a defense for crime. The trial court had
charged the jury that—" only persons of sound mind in law
can be convicted of crime."    .    .    When considered (in-
sanity) in relation to crime, it is a general rule that persons
who are in that relation which the law recognizes as of un-
sound mind, are not responsible criminally for their acts
when in that condition. But it is also true that mere weak-
ness of mind alone, or slight mental ailments which do not
exclude that knowledge of right and wrong, and the power
to act in accordance with the plain dictates of reason and
justice, do not constitute unsoundness of mind in the law.
    .    .    In cases of partial insanity, when the mind may be
clouded and weakened, but not remembering, reasoning, and
judging ; or, so perverted by insane delusions as to act un-

[Parsons v. State.]

der false impressions or influences. In these cases the rule
is this : A man is not to be excused from responsibility if
he has capacity and reason sufficient to enable him to dis-
tinguish between right and wrong as to the particular act
he is then doing, (to have) a knowledge and consciousness
that the act he is then doing is criminal and wrong, and will
subject him to punishment. In order to be responsible, he
must have sufficient power of memory to recollect the rela-
tions in which he stands to others, and in which others stand
to him ; that the act he is doing is contrary to the plain dic-
tates of justice and right, injurious to others and in viola-
tions of the dictates of duty. On the contrary, although he
may be laboring under partial insanity, if he still under-
stands the nature and character of his act, and its conse-
quences, if he has a knowledge that it is wrong and crimi-
nal, and a mental power sufficient to apply that knowledge
to his own case, and to know that if he does the act he will
do wrong and receive punishment, such partial insanity is
not sufficient to exempt him from responsibility for criminal
acts. He is then not insane. The true test is this: Has
the defendant in a criminal case the power, to distinguish
right from wrong and the power to adhere to the right and
avoid the wrong? Has the defendant, in addition to this,
the power to govern his mind, his body and his estate? If
he has these powers he must exercise them. He is then in
law not a person of unsound mind, and the law will hold
him answerable for his acts. But if his mind be so unsound
that he has them not, then the law will excuse his act by
reason of the unsoundness of his mind."

Speaking of the ruling on these charges, and another not
material to the inquiry before us, the revising court said,
"considered as a whole,   .   .   it contains nothing materially
injurious to the appellant." ·

The case of *Harris v. State*, 18 Tex. Ct. App. 287, pre-
sented the question of moral insanity—kleptomania—held
a valid defense by that court. There was nothing decided
material to the question we have in hand.

*Smith v. Commonwealth*, 1 Duv. 224, declares two proposi-
tions : First, that moral insanity is a defense to a prosecu-
tion for crime. The insanity relied on was, that the prisoner,
when he perpetrated the homicide, was drunk, and that
"such a condition superinduced moral insanity." The
second proposition of the opinion was that a reasonable
doubt of the prisoner's sanity justified an acquittal. This
case was decided in 1864.

In the later case of *Kriel v. Commonwealth*, 5 Bush 362, the
defense of reasonable doubt of sanity was expressly held in-

[Parsons v. State.]

sufficient. In the opinion is the following clause : "If there be mental or moral-insanity, however recent, to such an extent as to destroy free agency and moral responsibility, on being established by satisfactory evidence, this will excuse." In the same opinion, after stating that drunkenness may be of such a character and to such a degree as to repel all idea of malice, and to reduce a homicide from murder to manslaughter, it is added : "But as this state of mind is superinduced by the wrongful act of the pepetrator, a due regard for the interest of society and the personal security of every one, precludes it from being a satisfactory excuse, and an entire exemption from punishment. Indeed, if it appeared that intoxication excited the animal passions and aroused a destructive propensity in the accused, why should even drunkenness in such a case be considered a mitigating cause, any more than the unchaining a mad dog in the streets of a town, or the riding a vicious animal into a crowd, merely because the perpetrator had no particular malice at any one, or indeed expected death at all to ensue ; yet, if by reason thereof, any one should lose his life, this recklessness is set down as malice towards mankind in general, and the perpetrator criminally responsible in the highest degree ? "

The case of *Cunningham v. State*, 56 Miss. 269, declares principles which I am unable fully to reconcile. It first allows a reasonable doubt of sanity, engendered by the evidence, to be a defense against a charge of crime, but declares that the burden of proving insanity is on the defendant. It next adopts the right and wrong theory, or capacity to perceive the difference between right and wrong as the test of insanity. It then adopts the rule declared by the judges in the McNaghten case as applicable to cases of mental delusion. The views of Justice Chalmers in the latter part of his opinion rendered in this case, I re-produce entire. The court below had been requested to instruct the jury that " there is no responsibilty for an act committed under the uncontrollable impulse resulting from mental disease." On this clause of the charge, the court expresses itself as follows :

"The second clause declares that there is no responsibility for 'an act committed under the uncontrollable impulse resulting from mental disease.' If the impulse meant is the direct result of such mental disease as destroys the perception of right and wrong, this is only a re-affirmation of the doctrine announced in several preceding charges, and it derives no additional strength from the prefix of the word 'uncontrollable.' But there is said to be an uncon-

[Parsons v. State.]

trollable impulse springing from a mental condition quite different from this,—a state of the mind which perfectly perceives the true relations of the party, and recognizes all the obligations thereby imposed, but which, is unable to control the will.

"This character of insanity is variously styled moral, or emotional, or impulsive, or paroxysmal insanity. It is known among medical writers as lesion of the will. Its peculiarity is said to be that, while the mental perception is unimpaired, the mind is powerless to control the will; that while its unhappy subject knows the right, and desires to pursue it, some mysterious and uncontrollable impulse compels him to commit the wrong, This kind of insanity, if insanity it can be called, though sometimes recognized by respectable courts, and still oftener, perhaps, by juries seeking an excuse to evade the stern dictates of the law, is properly rejected by the authorities generally. The possibility of the existence of such a mental condition is too doubtful, the theory is too problematical, and too incapable of a practical solution, to afford a safe basis of legal adjudication. It may serve as a metaphysical or psychological problem, to interest and amuse the speculative philosopher, but it must be discarded by the jurist and the law-giver in the practical affairs of life. To it may well be applied the language of Judge Curtis, who, in speaking of this and similar questions, says : 'They are an important, as well as a deeply interesting study, and they find their place in that science which ministers to diseases of the mind. * * * But the law is not a medical nor a metaphysical science. Its search is after those practical rules which may be administered without inhumanity, for the security of civil society by protecting it from crime. And therefore it inquires, not into the peculiar constitution of mind of the accused, or what weakness, or even disorders, he was afflicted with, but *solely whether he was capable of having, and did have, a criminal intent.* If he had, it punishes him ; if not, it holds him dispunishable.'—*United States v. McGehee*, 1 Curt.1.

"The latter clause of the instruction in question is copied—as, indeed, the whole instruction is,—from the syllabus, or head-notes, of *The Commonwealth v. Rogers*, 7 Metc. 500, but it fails to embody the qualification and restriction thrown around the doctrine in the opinion itself."

"The uncontrollable impulse, which the learned chief justice declares will excuse the act, is said to be that overwhelms reason, conscience, and judgment.' 'If so,' says he, 'then the act was not the act of a voluntary agent, but the involuntary act of the body, without the concurrence of the

[Parsons v. State.]

mind directing it.' In other words, it is the uncontrollable act of a mind destitute of reason, conscience, or judgment as to the particular object, however sane as to other matters. The latter clause of the instruction, therefore, should have been restricted by words conveying the idea that the act was the direct result of an uncontrollable impulse, springing from mental disease, existing to so high a degree that for the time, it overwhelmed the reason, judgment, and conscience."

In *Com. v. Rogers*, 7 Metc. 500—a case tried before Shaw, C. J.—the defense was rested on mental delusion. The sum of the instructions is contained in the following extract :

"The questions, then, in the present case, will be these : 1. Was there such a delusion and hallucination? 2. Did the accused act under a false but sincere belief that the warden had a design to shut him up, and, under that pretext, destroy his life; and did he take this means to prevent it? 3. Are the facts of such a character, taken in connection with the opinions of the professional witnesses, as to induce the jury to believe that the accused had been laboring for several days under monomania, attended with delusion ; and did this indicate such a diseased state of the mind, that the act of killing the warden was to be considered as an outbreak or paroxysm of disease, which for the time being overwhelmed and superseded reason and judgment, so that the accused was not an accountable agent?"

"If such was the case, the accused is entitled to an acquittal ; otherwise, as the evidence proves beyond all doubt the fact of killing, without provocation, by the use of a deadly weapon, and attended with circumstances of violence, cruelty, and barbarity, he must undoubtedly be convicted of wilful murder."

In the case of *Dejarnette v. Com.* 75 Va. 867, the principle declared is embodied in the following extract from the opinion : "In every case, although the accused may be laboring under partial insanity, if he still understands the nature and character of his act, and its consequences, and has a knowledge that it is wrong and criminal, and a mental power sufficient to apply that knowledge to his own case, and to know that if he does the act he will do wrong and receive punishment, and possesses withal a will sufficient to restrain the impulse that may arise from a diseased mind, such partial insanity is not sufficient to exempt him from responsibility to the law for his crimes." This court recognized moral insanity as a defense.

So, in Pennsylvania, the court receives the defense of moral insanity as an answer to a criminal accusation. In

*Boswell's* case we commented on C. J. Gibson's language, as used in *Com. v. Mosler*, 4 Barr 264, and disapproved it. In *Coyle v. Com.*, 100 Penn. St. 573, decided in 1882, the trial court had repeated to the jury the language of C. J. Gibson, which we copied in Boswell's case. This was urged as a ground of reversal in the Supreme Court. In reply, the court said :

"The able argument of counsel has failed to convince us that this was not a correct declaration of the law, or that it has since been ruled otherwise by this court. The validity of such a defense is admitted, but the existence of such a form of mania must not be assumed without satisfactory proof. Care must be taken not to confound it with acts of reckless frenzy. When interposed as a defense to the commission of a high crime, its existence should be clearly manifested. Such defense is based on an unsound state or condition of the mind, proved by acts and declarations of violence. It certainly is not requiring too much to hold that it shall be shown in more than a single instance. We know no later case in this State where the precise question has been ruled otherwise." Nothing else is said in that case which is material to the subject I am considering, except that the court repudiates the right of acquittal, if the testimony simply raises a reasonable doubt of sanity. The insanity relied on in that case was homicidal mania; a so-called form of insanity which this court declines to recognize as a mental disease.

The Connecticut cases need but a passing notice.—*State v. Johnson*, 40 Conn. 136, presented the defense of dipsomania. In that case they not only permitted the defense of moral insanity, but, when insanity was the defense, the State was at that time required to prove sanity beyond a reasonable doubt. A discussion of the questions there considered would present no new features.

The case of *Anderson v. State*, 43 Conn. 514, scarcely raises a question material to the line of thought I am pursuing. The majority of the revising court—three to two— granted petitioner a new trial, rather against legal rules, because in their judgment he had not had his case fully and sufficiently represented in the court below. The profession, on reading it, would not esteem it a safe or valuable precedent.

In the later case of *State v. Hoyt*, 46 Conn. 330, that court qualified its rulings by holding that proof of the insanity of a person accused of crime is a matter of defense wholly, and the burden of proving it rests on the accused.

The case of *State v. Pike*, 49 N. H. 399, was decided in

[Parsons v. State.]

1870. The defense relied on was dipsomania—an inordinate craving of alcoholic stimulants. The defendant was convicted of murder in the first degree. The chief questions discussed on error arose on the refusal of the court to give the following instruction to the jury:

"The defendant requested the court to instruct the jury that the sanity—the mental capacity of the defendant to commit any crime charged in the indictment—is a fact to be proved by the State beyond all reasonable doubt; that there is no legal presumption of sanity, which can have any weight with the jury as a matter of law; that there is no legal presumption of sanity which is a substitute for evidence, or which, as a matter of law, affects the burden of proof in criminal cases."

An offer had been made, in the court below, to prove, by non-expert witnesses, their naked opinion that the accused was insane when he committed the homicide. This testimony had been rejected, and it was claimed that in this ruling there was error.

The majority opinion of the court was delivered by Smith, J., affirming the judgment, in which all the justices, except Justice Doe, appear to have concurred. Then follows a most elaborate opinion by Justice Doe, which I can but regard as a dissenting opinion, although not so expressed in the book. It covers thirty-six pages, discloses much thought, reading, and research, and is expressed in a bright, incisive, combative style. He first devoted many pages to prove that all witnesses—non-experts as well as experts—should be allowed alike to testify to their opinions of a prisoner's insanity. In this he opposed the views of his brother justices, and he stands opposed to our uniform rulings, which I need not cite. He also declared, in terms, that "There was error in the refusal of the court to instruct the jury that there is no legal presumption of sanity; and also in the instruction that every person of mature age is presumed to be sane until there is evidence tending to show insanity." In this he also stood opposed to his brother judges. He did more. He antagonized every authority I have ever seen or heard of on the subject. And, as I understand his position, he took the ground that there are no legal tests on the subject of sanity or insanity; that the judges can give no directions for determining such issue, and that it is solely and purely a question of fact, to be determined by the jury, on the sworn testimony before them: The presiding judge must give no instructions or directions as to the constituents or classifications of mental disorders, nor as to the dividing line which separates ac-

[Parsons v. State.]

countable sanity from irresponsible insanity :  To allow him to do so, would be to receive unsworn testimony from a non-expert witness.  The result of this is that the judge must sit quietly by in his supposed ignorance, as a silent looker on, while the forensic battle is waged between opposing counsel, with their expert, opinion testimony, before the jury, as the sole triers and arbiters of the facts.  Who is to determine the pertinency of the evidence offered?  Not the presiding judge, for not knowing what constitutes insanity, he can not know what facts and circumstances tend to prove its existence.  Can there be judicial administration without a presiding umpire to determine the disputes of opposing litigants?  As well put a locomotive engine in motion without an engineer, or launch a ship without a pilot or rudder.

The error of Judge Doe's position, as I understand it, and, in fact, of the whole New Hampshire court, lies in the assumption that the question of sanity or insanity is one purely of fact.  I admit it is largely so ; but no question of judicial contestation can ever become solely a question of fact.  Law pervades every human transaction, every question of status, every inquiry of right and wrong, as vital force pervades every fibre, every corpuscle of the living animal.  The legal element may be agreed between the contestants, and hence may not be visible.  Still it is there, and defines and determines what the issue is, and how the suit is to be maintained or defeated.

It is my opinion that the inquiry of insanity, like most others in judicial administration, is a mixed question of law and fact.  Of law, as to the extent and measure of mental disorder, which absolves from legal accountability. Of law, necessarily, in determining the pertinency of testimony offered in proof or disproof of the alleged mental disorder.  Like most, if not all other courts, whose utterances on these questions have fallen under my observation, this court stands unmistakably committed to this doctrine. Hence, we have held that what is called emotional, or moral insanity is not a disease of the intellect, but sheer depravity—a surrender of the higher teachings of conscience, to baser and debased passions, instincts, and appetites. This we hold, the intellectual faculties remaining sound, is no defense to a criminal accusation.  Hence we have held (and I understand my brothers as asserting it in this case), that to excuse conduct otherwise criminal, on the plea of insanity, the mind proper, as distinguished from the emotions, must be diseased, and the act charged must have been connected with that disease, as effect with cause. Hence we have held, and so decide in this case, that on the
39

[Parsons v. State.]

trial of such issue in the primary court, the presiding judge is within proper bounds, when he determines what testimony is, and what is not pertinent to the issue.

It will have been observed that the cases I have collated and considered were decisions made by courts which hold that moral insanity is a defense to a criminal prosecution. I think this fact should be considered in weighing their value as authority. The phrases, " sudden impulse," and " overpowering or subverting the will," are frequently encountered in the opinions delivered in those cases. Impulse is emotional rather than intellectual. It is a sudden emotional influence brought to bear *on* the will as an intellectual faculty, and, as a rule, not the offspring of the reasoning faculties. It is rather the antithesis of a formed judgment. It differs from the cognitive, or knowing faculty, and not infrequently so dominates the latter, as to acquire, for the time, the mastery of the will. The will, the executive faculty of the mind, can not, with propriety, be said to be subverted. To be subverted or overturned is to cease to have purpose—to cease to act; for without the function of the will, there can be no physical action. The will retains all its power, but, for the time, ceases to act in harmony with the knowledge-possessing faculty. It is *perverted*, but not subverted. I am speaking in common parlance, and employing language in its popular sense. When the will is perverted by a disease of the brain, or intellectual faculties, then any act caused thereby is blameless in the sight of the law. On the other hand, if there be no disease of the intellectual faculties, and the act done, though by a very perverted will, is nevertheless the offspring of moral depravity, debauched appetite, blunted sense of right, or other kindred prompting of a wicked heart, then for such an act there is a moral and legal accountability in the amplest sense of those terms. The murderer, the assassin, the burglar, the incendiary, can truthfully plead that their wills have ceased to be the executors of their intellectual promptings. Criminal passion or appetite has obtained mastery over their higher and purer intellectual endowments, and perverted their wills to its baser uses.

I have indulged in these reflections, because I think the expressions " sudden impulse," and " subversion of the will," are inaccurate and misleading; at least, under our jurisprudence.

Keeping myself reasonably abreast with advanced thought, and with the later and better understanding of mental disorders, I am willing to disclaim, as untenable, one of the tests of legal accountability declared by the

[Parsons v. State.]

judges in the McNaughten case. That was a case of partial insanity, called "mental delusion." There can be no difference, in a legal point of view, between delusion, illusion, and hallucination. In that case it was said that the delusion would be a defense, only when the supposed facts if real, would have justified the act done. This rule is too exacting. At the head of this opinion I have presented my views of the questions discussed in the form of *syllabi*. (

In the present case the wife and daughter were tried and convicted of the murder of the husband and father. The homicide was perpetrated with a gun, in the hands of the daughter, at the alleged instigation of the wife. The defense interposed for the daughter was idiocy. The wife's defense was insanity, in the form of mental delusion. The delusion or hallucination, was, her alleged belief in a supernatural power and influence the husband had and exercised over her, by which he could bring sickness and even death upon her. That by the exercise of this power he had brought on her protracted sickness, and she feared and believed he would ultimately destroy her life. Of course, this fear and belief could only be gathered from her own conduct and expressions of belief and fear.

If this delusion proceeded from mental disorder, or defective mental organism, it is questionable if the case does not fall directly within the rule declared in the McNaghten case. If the wife believed her husband possessed supernatural power over her by which through unseen influences, he could bring upon her disease, and even death; that he had exerted that power, and caused her to be sick for a great length of time, and, she believed, intended ultimately to take her life, in what manner could she rid herself of such impending peril? She could not flee away from it if she would; for the power being supernatural, it could pursue her whithersoever she fled. Supposing her delusion to be a fact, how could she save her own life, by any preventive measures short of taking his?

Was her alleged delusion insanity? Was it, if it existed, a disease of the reasoning faculty? What say psychological experts on this subject? It is believed that the delusion claimed for her is a very common superstition with the grossly ignorant, particularly among the colored population. Less than three centuries ago the whole English-speaking people labored under this delusion, or superstition, and called it witchcraft. So firmly did they believe it, that they made the practice of it a capital felony. Many unfortunates to whom this dark art was imputed, paid the penalty by the most torturing of all known methods of inflicting the death

sentence.   Were our ancestors, from the King on his throne to the laboring peasant, all insane ?   Even the great and good Sir Matthew Hale was a believer in witchcraft.   He said, "That there were such creatures as witches he made no doubt at all ; for, first, the Scriptures had affirmed so much. Secondly, the wisdom of all nations had provided laws against such persons, which is an argument of their confidence of such crime."

On the other hand, if the great, the noble, and the learned, two or three centuries ago, slaughtered men and women indiscriminately as the imputed possessors of this demoniacal power, and under all the forms of law and for the public welfare, is it right to make an example of one ignorant, superstitious woman, if she destroyed one life as the only means, to her benighted vision, of saving her own ?   Of course this is stated on the hypothesis that she really believed her husband possessed, and was exercising this dangerous power.

Let us pursue this line of thought a little further.   In the world are very many religious faiths, each, perhaps, asserting a divine or supernatural inspiration.   Take three of the most prominent, the Christian, the Mohammedan and the Buddhist; each numbering its adherents by the hundred millions.   With each of these faiths the professions of the other two are mere superstitions or hallucinations.   Are the invocations to Allah and to the "Elightened One" any more an illusion to our comprehension than Christian worship is to theirs ?   Our faith, we maintain, is founded alike on Divine revelation and the inherent evidences of its purity and truth.   Is their mental delusion a species of partial insanity ?   And if in the zeal of the religion of Mohammed, propagation by the sword is believed to be a duty, is such act to be excused on the score of mental illusion ?   What of the believers in spiritualistic materializations, mind-reading, and, the many other isms which live their brief day, and are not without a following.   Are the believers in such supernatural power mentally diseased ?   Such enquiries may be amusing, if not interesting, to the visionary and speculative.   They can only bewilder when applied to the actual transactions of business life.   Judicial administration is too real to enter upon such doubtful and dangerous speculations.   In the language of Judge Curtis, "It searches after those practical rules which may be administered without inhumanity, for the security of civil society by protecting it from crime.   It inquires not into the peculiar constitution of mind of the accused, or what weakness, or even disorders he was afflicted with, but solely whether

[Parsons v. State.]

he was capable of having, and did have a criminal intent."
I hold we should take our steps cautiously, in adopting the
theories of psychological enthusiasts, lest we disarm retrib-
utive justice of all its restraining energy.

This is a dissenting opinion, and I wish to be understood
as intimating no opinion, either one way or the other, on
the sufficiency or insufficiency of the asserted insanity, re-
lied on in this case. It being, under the opinion of my
brothers, a question of fact for the jury, I will leave it to
them, without any attempt to bias them by anything I may
say.

I regret the necessity I have felt resting on me of differ-
ing with my brothers in this case. I regret what I con-
ceived to be a duty to express my views so much at length.
On a question of less importance I would not have done so.
I have feared, however, and still fear, that the effect of their
ruling will be to let in many of the evils which result from
allowing the defense of emotional insanity. I acquit them
of all intention to alter the rule of this court on that sub-
ject. Still, I think the line can not be too clearly and sharply
drawn, which separates the pitiable, unfortunate victims of
diseased mental faculties, from the recklessly depraved,
whose chief evidence of insanity is found in the causeless
atrocity of their crimes. Human life has become all too
cheap ; and while we spread the mantle of mercy over the
criminally irresponsible, the lawless should be made to feel
that the way of the transgressor is hard. The terror of the
law may thus become a minister of peace.