[Brown v. The State.]

# Brown v. The State.

*Indictment for Murder.*

1. *Oath of grand jury ; sufficiency of recitals as to* —When the record recites that the oath prescribed by the statute was taken by the foreman and the other members of the grand jury, the recital implies that the oath was administered by the court, or in its presence, and under its sanction, and is sufficient.

2. *Joinder in issue.*—The *similiter*, or joinder by the State in the issue tendered by the plea of not guilty, is merely a formal matter, and the failure of the record to recite it is an amendable defect.

3. *Special venire; presumption as to return of.*—It is not necessary that the record, in a capital case, shall show that the special *venire* was returned into court by the proper officer : when no objection was raised in the court below, based on the failure to return it, and the defendant participated in the selection of the petit jury, this court will presume that the return was properly made, or that it was waived.

4. *Sentence to penitentiary.*—Under a conviction of a felony, a sentence to *hard labor* in the penitentiary is, in substance and legal effect, no more than a sentence to imprisonment in the penitentiary, and contains no reversible error.

5. *Self-defense.*—There is no foundation in law for the proposition, that any violent assault, importing peril or injury to the person, may be resisted or repelled to the extremity of taking the life of the assailant; life may lawfully be taken, only in resistance of a felonious assault—that is, an assault threatening or imperilling life or grievous bodily harm.

6. *Dying declarations; charge as to.*—The deceased having been killed by the defendant while engaged in a hand-to-hand combat, one having a pistol, and the other a knife in his hand ; the subsequent declaration of the deceased, " *I would have gotten him, if he had not been too quick for me,*" can not be regarded as the mere expression of an opinion by him, but rather characterizes, as matter of fact, both the *animus* and the avidity with which he engaged in the affray ; and having been admitted by the court below as dying declarations, a charge requested, instructing the jury that they " are authorized to consider the dying declaration of the deceased, in forming their conclusions as to what might have influenced the defendant's mind, as to the necessity of his striking or shooting for the preservation of his life, or to save himself from great bodily harm," is improperly refused. (BRICKELL, C. J., dissenting.)

7. *Homicide in personal combat, willingly entered into by both parties.* When two persons engage willingly in a personal combat, each having a deadly weapon, and the assailant is killed ; the other party can not be held guiltless, unless he had retreated as far as he could with safety to himself ; and neither the bad character of the deceased, nor past threats and hostile actions, relieve from this duty, or excuse the killing of the assailant, though they may be looked to, in connection with the present demonstrations, in determining whether the slayer had a just and reasonable apprehension of imminent peril to life, or grievous bodily harm.

FROM the Circuit Court of Clarke.

Tried before the Hon. WM. E. CLARKE.

VOL. LXXIV.

[Brown v. The State.]

The indictment in this case charged, " that Edwin J. Brown, *alias* Ed. Brown, unlawfully and with malice aforethought killed David S. Jordan, by shooting him with a pistol." The minute-entry relating to the organization of the grand jury, by which the indictment was found, contains the following recitals: " It appearing to the satisfaction of the court that there was then a sufficient number present to constitute the grand jury, and that said persons had been drawn and summoned according to law, and that they are qualified to serve as grand jurors; thereupon, T. B. Morris, having been appointed foreman of the grand jury, took the oath prescribed by law, as set forth in section 4755 of the Code of Alabama, and the other members of the grand jury took the oath prescribed by law, as set forth in sections 4755 and 4756 of the Code of Alabama; the court thereupon charged the jury, and they were placed in charge of T. A. Creighton, who was sworn as bailiff; whereupon they retired to their room." The entries showing the trial, verdict and judgment, are in these words: " This day came the State of Alabama, by its solicitor, Geo. W. Taylor, and came also the defendant, in person and by counsel, and pleads not guilty to the charge in the indictment; and thereupon came a jury," &c., " who, being duly tried, impanelled and sworn, according to law, upon their oaths do say, ' We, the jury, find the defendant guilty of murder in the second degree, and affix the penalty at ten years in the penitentiary.' " . . . " This day came the State, by its solicitor, and the defendant, Edwin J. Brown, was brought into court to receive sentence," &c., " and being personally present, he was asked by the court, if he had any thing to say why the judgment of the law should not be pronounced against him ; to which he said, nothing material. It is therefore considered by the court, that the sheriff of Clarke county detain the said Edwin J. Brown, until called for by the warden or keeper of the penitentiary of the State of Alabama; and that he be delivered into the custody of the said warden or keeper ; and that he be confined at hard labor in the penitentiary, for the term of ten years."

On the trial, as the bill of exceptions shows, it was proved that the difficulty between the parties, in which Jordan was killed, occurred on the 18th June, 1881, in the office of a justice of the peace, during the trial of a prosecution before him for trespass after warning, brought by Brown against Jordan and his two sons ; and the particulars of the difficulty were thus stated by the justice, who was examined as a witness for the State: "After the defendant (Brown) had been sworn as a witness, and had given in his testimony, which was taken down in writing by one York, who was acting as clerk for said justice, York handed the statement to said defendant to be signed, and

[Brown v. The State.]

handed it to him on a thin piece of board (the top of a cracker-box) which said York had been using to write on ; and as defendant was signing his name to his evidence, with the board in his lap, the deceased said something, which witness did not exactly understand, but thinks it amounted to an accusation of perjury; and thereupon the defendant jumped up, and struck the deceased over the head with the board, splitting it to pieces. The deceased then seized the defendant, and forced him back over the feet and legs of witness, knocking him down, and also knocking the defendant down. The deceased raised up both of his hands as Brown struck him, both hands being open, and witness saw no knife in them. Witness called to York to help to separate them, and caught hold of defendant while York caught Jordan, and pulled him back, when the defendant fired one shot while York had hold of deceased. York then turned him loose, and he started towards Brown, when Brown fired the second shot as he was rising, and the deceased then said, '*Oh, he has got me, I am killed.*' Witness then called on Brown to give up his pistol and surrender," and he did so. This witness testified, also, to repeated threats made by the deceased against Brown, and said that they had had frequent quarrels in his presence. Several other witnesses, who were present at the time, testified as to the particulars of the difficulty substantially as stated by the justice ; and some of them testified to former threats by the deceased, on different occasions, and to his general reputation as a quarrelsome and violent man, though others regarded him as half-crazy and not dangerous. There was some evidence, also, tending to show that the deceased, when the difficulty commenced, had a knife in his hand.

"B. A. Clanton testified, that he was keeping the ware-house at Coffeeville when Jordan came there one night, in February, 1881, to take a steamboat, and asked for oil to grease his pistol, which he showed to witness ; and said he had heard that Brown was going to take the boat there that night, and that he was going to kill him if he came. Witness advised him not to do so, but he said he would not take the advice. Witness assisted him to a neighbor's house after he was shot, where he stayed until he died. Witness did not see any knife. A day or two before his death, witness called to see him, and asked him how he was getting on ; when he said, that he was mighty bad off, and knew that he was going to die. Witness told him, he reckoned not. Deceased said, '*Oh, yes, I am. I ought to have taken your advice; but I would have gotten him* (Brown), *if he had not been too quick for me.*' Deceased was a strong, active man, much larger and stouter than Brown ; his character was that of a violent man, but witness did not know that he was a

dangerous man." This was all the evidence adduced as to this declaration of the deceased.

The defendant made a statement in his own behalf, in which he stated the circumstances attending the killing, and former threats made against him by the deceased on different occasions; and further said: "I acted in self-defense in this difficulty, and I thought at the time I shot Jordan that it was necessary to shoot in order to save my own life."

The defendant requested the following charges in writing:

"1. If the jury believe, from the evidence, that Jordan was, at the time of the shooting, making an assault upon Brown, in such manner, and under such circumstances, as would create a just apprehension in the mind of a reasonable man, of imminent danger to his person, Brown had a right to act upon such appearances, and kill his assailant.

"2. If the jury believe, from the evidence, that Jordan, at the time Brown shot him, had knocked or pushed Brown down on the floor, and was advancing on him in an angry and violent manner, and under such circumstances as to impress the mind of Brown with the reasonable belief that it was necessary for him to shoot Jordan, in order to protect his own life, or save himself from great bodily harm, then they must find the defendant not guilty.

"3. If the jury believe, from the evidence, that at the time Brown shot Jordan the circumstances were such as to impress his mind with the reasonable belief that it was necessary for him to shoot, in order to save himself from great bodily harm, such shooting would be justifiable, and they must find the defendant not guilty.

"4. If the jury believe, from the evidence, that Brown killed Jordan in a sudden broil, and while Jordan was making a violent assault upon him, and that such killing was in order to repel such assault, then they must find the defendant not guilty.

"5. If the jury believe, from the evidence, that the deceased was the aggressor in bringing on the fight, by using abusive language towards Brown, and immediately advancing on him in a hostile manner; and Brown was aware that the deceased had, recently before that time, made threats of killing him; and all the circumstances at the moment were such as to impress his mind with the reasonable belief that it was necessary for him to shoot, in order to save himself from great bodily harm, or loss of life,—then the jury must find the defendant not guilty.

"6. If the jury believe, from the evidence, that the deceased brought on the fight in which he was killed, by insulting Brown with abusive language, and immediately advancing on him;

31

[Brown v. The State.]

and Brown was aware that the deceased had, recently before that time, made threats of killing him; and all the circumstances, at the moment Brown fired the pistol, were such as to impress his mind with the reasonable belief that it was necessary for him to shoot, in order to save himself from loss of life, or great bodily harm,—then the jury must find the defendant not guilty.

"7. The jury are authorized to consider the dying declaration of Jordan, in forming their conclusion as to what might have influenced the defendant's mind, as to the necessity of his striking or shooting for the preservation of his life, or to save himself from great bodily harm.

"8. If the jury believe, from the dying declarations of the deceased, taken in connection with the other testimony in the case, that it was the intention of the deceased to bring on the difficulty, and take the life of Brown, or do him great bodily harm, and that he was only prevented from carrying such intentions into execution by Brown being too quick for him; then they must find the defendant not guilty."

The court refused each of these charges, and the defendant duly excepted to such refusal; and these were the only matters to which exceptions were reserved.

WM. S. ANDERSON, A. G. SMITH, and J. J. ALTMAN, for the appellant. (No briefs on file.)

H. C. TOMPKINS, Attorney-General, *contra*..

BRICKELL, C. J.—The several objections to the regularity of the procedure in the Circuit Court have been considered, and we are not of opinion that either of them can be supported. The first is, that it is not shown by the record by whom, or by what authority, the oath was administered to the grand jury. Conceding that it is essential to the regularity of the proceedings that it should affirmatively appear of record that, before the finding of the indictment, the grand jury were properly sworn, the fact now appears clearly and fully. The recital is, that the oath prescribed by the statute was taken by the foreman, and by the other members of the grand jury; which can not be true, unless the oath was judicial—unless it was administered by the court, or in its presence, and under its sanction. In practice, it is not usual to state upon the record by whom the oath was administered to the grand or to the petit jury. The recital that they were sworn, includes the statement that the administration of the oath was by proper authority.

2. The second objection is, that the plea of not guilty tendered an issue to the country, which the record does not show

was accepted or joined in by the State. The acceptance or joinder, if expressed upon the record, would have been merely an affirmation that, for trial, the State, as the defendant had done by the plea, put itself upon the country; the *similiter*, as it was known in common-law pleading, which is merely formal, and its omission an amendable defect.—1 Bish. Cr. Pr. §§ 801, 1354; 1 Chitty's Cr. Law, 720; *State v. Carroll*, 5 Ired. 139.

3. The failure to show on the record that the sheriff returned into court the special *venire*, or the list of jurors specially summoned for the trial of the cause, can not avail to reverse the judgment. If it was not in fact returned, upon objection interposed in the Circuit Court, the return would have been compelled; and whatever of benefit the appellant could have derived from it would have been afforded, and whatever of injury was apprehended from the omission would have been obviated. The objection not being interposed in the Circuit Court, and the appellant having voluntarily proceeded to trial before a jury, in the selection of which he participated, the just presumption is, that the return was made, or was waived.—*Ben v. The State*, 22 Ala. 9.

4. The remaining objection is, that the sentence condemns the appellant to *hard labor* in the penitentiary, while the legal punishment of the offense of which he is convicted is *imprisonment* in the penitentiary. The penitentiary, under the statutes, is not a mere place for the imprisonment of convicts: imprisonment in it involves subjection to involuntary or compulsory labor, during its continuance. Describing the labor as *hard*, does not signify that it shall be of unusual severity: it means no more than that it is compulsory, and continuous during the term of imprisonment. These words might well have been omitted from the sentence; but their insertion does not vitiate it, as they do not subject the appellant to any other than legal punishment, or to labor of any other kind or degree than must have been endured if they had been omitted.

5. The first and fourth instructions requested by the appellant, assume that any violent assault, importing peril or injury to the person, may be resisted or repelled, to the extremity of taking the life of the assailant. There is no foundation for such a proposition. Life can be taken lawfully, only in resistance of a felonious assault; an assault threatening or imperilling life or grievous bodily harm.—Whart. Hom. § 480; *Pierson v. The State*, 12 Ala. 149; *Eiland v. The State*, 52 Ala. 322.

7. The seventh and eighth instructions are objectionable, if for no other reason, because it is assumed the declarations proved to have been made by the deceased were *dying declarations*. It is not every declaration made by a deceased person while *in*

[Brown v. The Staie.]

*extremis*, or under a sense of impending death, that falls within the condition or class of *dying declarations*, as known in the law of criminal evidence. The subject of the declarations must be a fact or circumstance attending death, or the cause producing it. These declarations, if relevant or proper evidence for any purpose, had no reference to the facts and circumstances of the combat from which death resulted; but were, at most, only expressive of the opinion of the deceased, as to what would have been the result if the accused had not fired so quickly.

7. When the remaining instructions are taken in connection with the evidence, if they are not abstract, it is obvious they could not have been given without misleading the jury, unless other instructions explanatory of them, limiting and qualifying them, had been given. The killing was with a deadly weapon, in the course of a personal conflict, into which each party—the accused and the deceased—entered without reluctance. If it be true that the deceased was the aggressor, or assailant, the accused can not be held guiltless, until it appears that he had retreated as far as he could with safety to himself. It is the duty of one assailed, "to abstain from the intentional infliction of death, or grievous bodily harm, until he has retreated as far as he can with safety to himself."—*Eiland v. The State, supra; Pierson v. The State, supra.* Neither the bad character of the assailant, nor his past threats and hostile actions, relieve from the duty. These may be looked to, in connection with present demonstrations, in determining whether the accused had a just and reasonable apprehension of immediate, imminent peril to life, or of grievous bodily harm. They do not excuse or justify the taking of life, when that could be avoided by retreating before an assault, or retiring from a combat into which the slayer enters willingly. This court will not reverse a judgment, for the refusal of instructions which have a tendency to mislead the jury.—*Dupree v. The State,* 33 Ala. 380; 1 Brick. Dig. 339, §§ 60, 61.

SOMERVILLE, J.—A majority of the court are of opinion, that the judgment of the Circuit Court in this case should be reversed, because of the refusal to give the seventh charge requested by the appellant. It is no objection to the charge, that it assumes the declaration, proved to have been made by the deceased, to have been a dying declaration. The evidence shows such to be the case, without any conflict; and the matter was so determined by the court, as a question of law, preliminary to its admission in the first instance.

The pertinent portion of this declaration is, "*I would have gotten him*" [Brown], "*if he had not been too quick for me.*"

[Perry v. Danner & Co.]

The evidence shows that Brown and the deceased were engaged in a very close hand-to-hand contest, the former using a pistol, and the latter, as some of the witnesses testify, having a knife in his possession. This declaration of the deceased does not seem to us to be the mere expression of his opinion, but rather characterizes, as matter of fact, both the *animus* and the activity with which he engaged in the affray with the view of assailing his antagonist. It had reference to the facts and circumstances constituting the affray, and producing the death of the declarant. What should be the weight or effect of this declaration, as evidence, is a matter exclusively for the determination of the jury, and on this point we abstain from intimating any expression of opinion.

For this cause the judgment must be reversed, and the cause remanded. In the meanwhile, the prisoner will be retained in custody, until discharged by due process of law.