# Gunter *v.* The State.

*Indictment for Murder.*

# *Ex parte* Gunter.

*Application for Habeas Corpus.*

1. *Construction of statutes in Code.*—In the construction of statutory provisions which have been embodied in the Code, the court will examine the original statute; and where two sections are inconsistent, or in conflict with each other, will give effect to the enactment of later date, as modifying or amending the former.

(a) *Punishment by imprisonment at hard labor.*—Under the statute specifying and regulating punishments generally (Code, § 4450), imprisonment in the penitentiary involves hard labor for the State; when a sentence to imprisonment or hard labor is imposed, on a conviction of felony, the law fixes the place of punishment; the duty of imposing it is reposed in the presiding judge, and the discretion of the jury extends only to fixing the term.

(b) *Manslaughter in first degree; punishment of; sufficiency of verdict.* A verdict finding the defendant guilty of manslaughter in the first degree, and fixing the punishment at "thirty months hard labor" (Code, §§ 4303, 4450), authorizes and requires a sentence to the penitentiary for that term.

2. *Defective or irregular verdict; jeopardy a second time.*—The discharge of the jury in a criminal case, without consent, and without legal necessity, before they have rendered a verdict, operates as an acquittal, and the defendant can not be again put on trial; but an irregular or defective verdict, such as will compel a reversal of the judgment, does not entitle him to a discharge, nor operate as a bar to a second trial after the reversal.

3. *Cross-examination of witness as to former statements under oath.* When the testimony of a witness, on the preliminary examination of the defendant before a committing magistrate, was reduced to writing and subscribed by him, and the deposition is in court on the trial, he can not be cross-examined as to the statements then made by him, without allowing him to hear or read the deposition; and the rule is the same, whether the purpose of the cross-examination is to impeach him, to test the accuracy of his recollection, or to refresh his memory.

4. *Opinion and testimony of medical expert.*—When the defense of insanity is interposed in a criminal case, a practicing physician may be asked his opinion, as a medical expert, on a similar case hypothetically

[Gunter v. The State.]

stated; but, where the evidence is conflicting, both as to the facts in proof and the opinions of experts as to the condition of the defendant's mind at the time of the homicide,' he can not be allowed to state his opinion, on the whole evidence, as to the condition of the defendant's mind, since that would usurp the functions of the jury.

5. *Insanity as defense; measure of proof.*—Insanity, when interposed as a defense in a criminal case, must be established to the satisfaction of the jury by a preponderance of the evidence; and a reasonable doubt arising from a consideration of all the evidence, either as to the fact of insanity, or the causal connection between it and the criminal act, does not authorize an acquittal.

6. *Charge as to sufficiency or weight of evidence; opinion of medical expert.*—How.much weight is to be given to evidence legally admitted, is a question going to its sufficiency, and is one purely for the jury, except where the general affirmative charge may properly be given; and therefore, wheie the opinion of a medical expert has been admitted, based on facts hypothetically stated, which vary somewhat from the facts proved on the trial, a charge instructing the jury that, in consequence of this variance, his opinion "is entitled to but little weight," is properly refused.

7. *Insanity resulting from intoxication.*—Mental disorders can not be regarded as evidence of insanity proper, such as exculpates from legal responsibility, "unless they are caused by, or result from disease, or lesion of the brain;" and this may result, as a secondary or remote consequence, from habits of intoxication, or the excessive and protracted use of alcoholic stimulants; but "there is a species of insanity, or mental unsoundness, manifested by a temporary depression or aberration of mind, which sometimes attends or follows intoxication, and is often accompanied by delusions, hallucinations and illusions, which are said to be 'insane delusions,' but do not constitute such insanity as confers legal irresponsibility for crime."

(a) *Charge misleading jury.*—A charge asked in a criminal case, which uses the ambiguous terms, "fit of mania" and "insane delusions," as an excuse for crime, not distinguishing between those which are and those which are not evidence of insanity proper, tends to mislead the jury, and is properly refused.

▯From the Circuit Court of Autauga.

Tried before the Hon. JAMES W. LAPSLEY

The opinion in this case states most of the material facts. As to the questions propounded to Dr. J. B. Gaston, the bill of exceptions contains this statement: "Eight practicing physicians, upon the evidence, having heard the whole of it, testified that, in their opinion, upon said evidence, assuming it to be true, the defendant was insane at the time he shot Montgomery. The defendant asked Dr. J. B. Gaston the following questions: 'Upon the whole of the evidence in this case, assuming it to be true, is it, or not, your opinion that the homicide was the result or offspring of a diseased brain?' 'Upon the whole of the evidence in this case (all of which you have heard), assuming it to be true, what is your opinion as to the condition of the defendant's mind at the date of the killing of Montgomery? Was his mind at that

7

time sane or insane? and if insane in your opinion, was the homicide so connected with such insanity, in the relation of cause and effect, as to have been the product of it solely?'" The court sustained objections to each of these questions, and the defendant excepted.

A written statement was admitted in evidence on the part of the State, as the testimony of Dr. P. Bryce, in which he expressed the opinion, based on certain facts hypothetically stated, that the defendant was not insane at the time the homicide was committed. Among the facts thus stated were these: "Some weeks after he [defendant] was committed to jail, he said he heard things which he did not hear, and saw things which he did not see, and gave satisfactory evidence that his mind was disordered to the extent that he was laboring under hallucinations and illusions of sight and hearing."

The defendant requested the following charges in writing, which the court refused to give, and he duly excepted to their refusal:

(1.) "If the jury believe from the evidence that the defendant was insane at the time of the killing of Montgomery, then they must acquit him, unless the evidence satisfies them, beyond a reasonable doubt, that such insanity was not the efficient cause of the act—that he would have done the killing even had he not been insane."

(2.) "If the jury believe from the evidence that the defendant was insane at the time he killed Montgomery, then, if they have a reasonable doubt as to whether such insanity was the cause of the killing, they must acquit him."

(3.) "In determining what weight is to be given to the opinion of Dr. Bryce, the jury must determine whether the facts upon which that testimony is based are shown by the evidence; and if the jury find from the evidence that the defendant had insane delusions on the day after the killing, then such opinion is entitled to but little weight."

(4.) "If the jury believe from the evidence that the defendant killed Montgomery in a fit of mania, he is not responsible, and they must acquit him."

(5.) "If the jury believe from the evidence that the defendant, at the time of the killing of Montgomery, was laboring under an insane delusion, and that he would not have committed the act but for the existence of such insane delusion, then they must acquit him."

(6.) "If the jury believe from the evidence that the opinion of Dr. Bryce, given in evidence in this case, is

[Gunter v. The State.]

founded on the assumption that the defendant gave no evidence of any insane delusions until some weeks after he was confined in jail, and if they further believe that the evidence in the case shows he had delusions on the day he was confined in jail, then such opinion is not entitled to much weight."

THOS. H. WATTS, H. C. SEMPLE, W. A. GUNTER, and H. C. TOMPKINS, for the appellant, made these points: (1.) The verdict of the jury is a nullity, and no legal sentence could be rendered on it; since a sentence to hard labor means hard labor for the county, and can not exceed two years.—Code, §§ 4450, 4303; *Steele v. State*, 61 Ala. 212; *Hobbs v. State*, 75 Ala. 1.

(2.) The verdict being not only informal but void, the court had no power to add to or change it, and the prisoner was entitled to be discharged.—*Bell & Murray v. State*, 48 Ala. 684; *Ned v. State*, 7 Porter, 187; *McCauley v. State*, 26 Ala. 136; *Wright v. State*, 61 Amer. Dec. 90; Bish. Cr. Law, §§ 1013–37; 1 Bish. Crim. Pro., §§ 1003–04; *Grogan v. State*, 44 Ala. 9; *Ex parte Vincent*, 43 Ala. 402; *State v. McKee*, 21 Amer. Dec. 500; *Teat v. State*, 24 Amer. Rep. 708; *Hines v. State*, 8 Humph. 597; 1 Whart. Amer. Crim. Law, §§ 574–8; *State v. Callendine*, 8 Iowa, 288; *State v. Alman*, 64 N. C. 364; *Mounts v. State*, 14 Ohio, 295; *State v. Connor*, 5 Cold. (Tenn.) 311; 39 Miss. 613.

(3.) The defendant should have been permitted, on cross-examination of the witness Taylor, to ask him the proposed questions as to his testimony on the preliminary examination; not for the purpose of impeaching him, but to test the accuracy of his memory; and because, if he made such statements, the evidence was material to the defense.—Stark. Ev. 202–05, 7th Amer. ed.; 1 Greenl. Ev. § 446; *Fralick v. Presley*, 29 Ala. 457.

4. The rule which requires the defense of insanty, in a criminal case, to be established by a preponderance of the evidence, is an exception to the general rule, and is founded on the legal presumption that every man is sane.—*Boswell v. State*, 63 Ala. 307; *Ford v. State*, 71 Ala. 385; *Ortwein v. Com.*, 76 Penn. St. 414. But the rule has never required that the defendant, having established the fact of insanity by a preponderance of evidence, should go further, and prove that the killing was the result of such insanity. As to that fact, the general rule must apply, which requires an acquittal if a

reasonable doubt exists; and that is the proposition asserted by the charges asked and refused.

THOS. N. McCLELLAN, Attorney-General, WM. M. BROOKS, and MOORE & FINLEY, for the State, cited *Dover v. State*, 75 Ala. 40; *Storey v. State*, 71 Ala. 329; *Waller v. State*, 40 Ala. 325; *Allen v. State*, 43 Ala. 391 ; 1 Bish. Crim. Law, § 884; *Parsons v. State*, 81 Ala. 577.

SOMERVILLE, J.—The prisoner was, in October, 1886, indicted for the murder of William D. Montgomery. The trial of the cause, on change of venue, occurred in August, 1887, and he was convicted of manslaughter in the first degree. The defense interposed was the alleged insanity of the prisoner.

The verdict of the jury is in the following words: "We, the jury, find the defendant guilty of manslaughter in the first degree, and assess his punishment at thirty months *hard labor*." The sentence of the court on this verdict was imprisonment in the *penitentiary* for thirty months.

The case comes before us by direct appeal, and on application for discharge of the prisoner through the writ of *habeas corpus*.

1.  It is first insisted that the verdict of the jury is void, or at least voidable, and that no judgment of conviction could be lawfully pronounced on it by the court. The argument is, that the words "hard labor," used in the verdict, must necessarily be construed to intend hard labor for *the county*, and not hard labor for the State, in the penitentiary or elsewhere, and that the jury had no authority to fix this particular punishment of hard labor at more than two years.

The difficulty arises from a real or apparent repugnancy between section 4303, of the Code of 1876, prescribing the punishment of manslaughter, and the act of March 7th, 1876, which is found condensed in section 4450 of the same Code, providing generally for the imposition of legal punishments in all cases of conviction for crime.

The first section referred to reads as follows, so far as material to this case:

"Any person who is convicted of manslaughter in the first degree, must, at the *discretion of the jury*, be imprisoned in the penitentiary, or sentenced to *hard labor for the county*, for not less than one year, nor more than ten years." Code, 1876, § 4303.

[Gunter v. The State.]

The other section, as condensed in part from, and amended by the act of March 7th, 1876 (Acts 1875-76, p. 287), after prescribing what shall be the several, and only legal punishments in this State, specifying among others hard labor for the county and imprisonment in the penitentiary, provides as follows:

"And in *all cases* in which the period of imprisonment or *hard labor* is more than two years, the sentence *must be* to imprisonment in the penitentiary; and in all cases of convictions for felonies, in which the imprisonment or hard labor is for more than twelve months, and not more than two years, the judge may sentence the party to imprisonment in the penitentiary, or confinement in the county jail, or to hard labor for the county, at his discretion; and in all cases in which imprisonment or sentence to hard labor is twelve months or less, the party must be sentenced to imprisonment in the county jail, or to hard labor for the county."—Code, 1876, § 4450.

The act of March, 1876, being more recent in date than section 4303 of the Code, must be construed to modify and amend it, so far as there may be any necessary conflict or incongruity between the provisions of the two statutes. And in construing section 4450, it is proper that we should examine the original statute from which it was codified. *Steele v. State*, 61 Ala. 213.

We are forced to draw three conclusions from this act, which we may formulate, as follows:

(1.) In all cases of convictions for felonies, however punishable, whether by imprisonment or hard labor, in the penitentiary or elsewhere, the law fixes the sentence, and the duty of imposing it is reposed in the presiding judge, circuit or city, as the case may be.

(2.) The place of imprisonment, or hard labor, is determined, not by the discretion of the jury, but by the period of time, or number of years for which it is assessed, or imposed. If this term of punishment is over two years, it *must be* in the penitentiary. It can not be elsewhere. If under two years and over one year, the sentence may, within the discretion of the judge, be either imprisonment in the penitentiary, or in the county jail, or to hard labor for the county. If the term of sentence, whether by imprisonment or hard labor, is twelve months or less, it can not be in the penitentiary. It must be in the county jail, or to hard labor for the county.

[Gunter v. The State.]

(3.)   The act thus necessarily embraces within the punishment of imprisonment in the penitentiary the idea of *hard labor for the State.*

We repeat, that the law itself thus grades the sentence, and the place and nature of the imprisonment in all cases, according to the number of years of imprisonment assessed by the jury, where the period is over two years, as in this case, or is twelve months or less.   The discretion of the jury, whether in convictions for manslaughter or other offenses, in such cases, has no room to assert itself in controlling or regulating the place or nature of the punishment, as being in the penitentiary or elsewhere.   Such discretion is exhausted in fixing the time, or number of years for which the punishment is to continue.   "In all cases," says the statute, "in which the period of imprisonment or hard labor is more than two years, the sentence *must* be to imprisonment in the penitentiary."—Code, 1876, § 4450.

The effect of section 4450, therefore, is to amend section 4303 so as to modify the discretion there reposed in the jury. It devolves on them to say, by their verdict, whether the defendant is guilty of the crime charged in the indictment, and to fix the degree of the homicide.   If the verdict be as here, guilty of manslaughter in the first degree, the only further discretion possessed by the jury is to fix the period, or number of years of his punishment.   If this term, as fixed, exceeds two years, the law, through the mouth of the judge, and not the jury, pronounces the sentence by adjudging the place, or nature of the punishment.—*Hobbs v. State,* 75 Ala. 1; *Steele v. State,* 61 Ala. 213.

This view of the law forbids us to conclude that the words "hard labor" in the verdict of the jury were intended to mean hard labor for the county.   This would be to conclude that the jury intended by implication to impose a sentence which they had no legal authority to do.   Hard labor does not necessarily mean hard labor for the county, because it had this signification prior to the enactment of the act of March 7th, 1876.   Since that enactment it may mean hard labor for the State, and be embraced in the punishment usually known as imprisonment in the penitentiary.   As said in *Brown v. State,* 74 Ala. 478, it may mean nothing more than compulsory labor, which is continuous during the term of the imprisonment; and in that case we held that a judgment of sentence to *hard labor* in the penitentiary was, in substance and legal effect, nothing more than a sentence to im-

[Gunter v. The State.]

prisonment in the penitentiary. Being mere surplusage, it was held not to vitiate the judgment. So, in our opinion, it may be expunged from the verdict in this case without in any manner altering its signification or legal effect.

This construction of the foregoing sections has been carried into the new Code by the commissioners who were appointed to revise and codify the public statutes, and the adoption of the Code is to be taken as a legislative sanction of this view of the law, In section 4492 of the Code of 1886, which corresponds to section 4450 of the Code of 1876, imprisonment in the penitentiary is made to include hard labor for the State—the phrase now being "imprisonment in the penitentiary, which *includes* hard labor for the State"— and section 3733 (Code, 1886) corresponding to section 4303, above discussed, is harmonized by striking out the phrase "or sentenced to hard labor for the county," so as to leave no discretion to the jury after a verdict of guilty, except as to the degree of manslaughter, and as to the term of imprisonment.

We can see no other reasonable mode in which these statutes may be construed, and we accordingly adopt this construction.

2. ' We may go further and say, that if this verdict be conceded to be *irregular*—so irregular as that a judgment of conviction rendered on it by the court were erroneous and reversible—it by no means follows that the discharge of the jury after the rendition of such verdict would operate as an acquittal of the defendant. Even in this aspect of the case, it would be the duty of this court to reverse the judgment, and remand the cause for a new trial. The question is an important one, and if the practice in such cases has not heretofore been clearly understood, we desire that it shall be in the future. The settled rule of this court, from its organization down to this day, has been not to permit a judgment of conviction, based on an irregular verdict, to operate as an acquittal, either before or after reversal on appeal, and a new trial, after remandment of the cause, is no infringement of that clause of our constitution, which declares that "no person shall, for the same offense, be twice put in jeopardy of life or limb."—Const. 1875, Art. I, § 10. The appellant's counsel contend for the proposition, that the discharge of a jury, without the consent of the defendant, or without legal necessity, before the rendition of a *verdict upon which the court may legally pronounce judgment*—by which we un-

[Gunter v. The State.]

derstand any verdict so irregular or defective as to necessitate a reversal—must, in effect, operate as an acquittal, so that the defendant can, in no event, be put on trial a second time for the same offense.

It is admitted that *Dover v. The State*, 75 Ala. 40, decided by this court as late as 1883, is directly opposed to this view. In that case, the verdict of the jury found the defendant guilty of murder, as charged in the indictment, and assessed his punishment to imprisonment for life in the penitentiary. The verdict was fatally defective in failing to find the degree of homicide, as expressly required by statute, and the Circuit Court passed sentence on the defendant in accordance with the verdict. The case was brought to this court, both by appeal, and on application for the prisoner's discharge on writ of *habeas corpus*, just as in the case now under consideration. The arguments made in that case were in substance those now made in this, and each contention was decided against the prisoner. The judgment was reversed, and the cause remanded for a new trial, this court refusing to discharge the petitioner.

The principles settled in *Dover's* case are fully supported by the uniform practice and the decisions in this court extending back for the past forty years. The precise question arose in *Cobia v. The State*, 16 Ala. 781, decided in 1849. The defendant was there convicted of murder, the verdict of the jury being defective in failing to state the degree of the homicide—a statutory requirement. The judgment of conviction was reversed, on the ground that the verdict, being defective, did not warrant the sentence pronounced by the court, which was imprisonment in the penitentiary. The question was directly presented, whether the prisoner should be discharged, as having been once in jeopardy, or whether he could be constitutionally put on trial again upon reversal of the judgment of conviction. It was contended that he should be discharged, "because he was regularly put upon his trial upon a sufficient indictment, and the evidence in support of the charge submitted to the jury; and that he was therefore in jeopardy," within the meaning of the thirteenth section of the first article of the constitution of 1819, which was, we may add, the same as article I, § 10, of our present constitution, relating to the subject of jeopardy in criminal cases. The court, after due deliberation, refused to sustain this view, and held the prisoner in custody for another trial. The true rule was held to be, that the dis-

[Gunter v. The State.]

charge of a jury, without legal necessity or consent, which will operate as an acquittal, is a discharge *before the rendition of the verdict* by the jury; and that a discharge after a defective verdict, on which judgment had been erroneously pronounced, was not such jeopardy as would prevent the defendant from being put on trial again upon reversal of the judgment on appeal at his instance. This we understand to be the doctrine of *Ned v. The State,* 7 Port. 213, which is referred to in *Cobia's* case. And as far back as the time of Hawkins and of Blackstone, it was generally said, in discussing this subject, that the jury could not be discharged, unless in case of evident necessity, "till they had given their verdict."—4 Black. Com. 461.

The true principle is conceived to be, that when once in legal jeopardy, by being put on trial, upon a sufficient indictment, before a court of competent jurisdiction, the defendant then becomes entitled to a verdict which shall constitute *a bar to a new prosecution* for the same offense. Cooley's Const. Lim. (5th Ed.), *327. A judgment of conviction on a defective verdict, or even a defective indictment, unreversed, would clearly constitute such a bar.—*Bell & Murray v. State,* 48 Ala. 684.

The case of *Waller v. The State,* 40 Ala. 325, fully sustains the same view; and the rulings are numerous and uniform, where the practice of reversing on an improper or defective verdict, which could not be made the predicate of a legal sentence, has been followed by retaining the prisoner in custody for a new trial.—*Storey v. State,* 71 Ala. 329; *Hall v. State,* 40 Ala. 698; *Levison's case,* 54 Ala. 520; *Field's case,* 47 Ala. 603; *Robertson's case,* 42 Ala. 509; *Murphy's case,* 45 Ala. 32; *Johnson's case,* 17 Ala. 618; *Cobia's case,* 16 Ala. 781; *Battle's case,* 7 Ala. 259; *Nabors' case,* 6 Ala. 200; *Hughes' case,* 2 Ala. 102. In *Kendall v. The State,* 65 Ala. 492, we held that where a judgment of conviction, based on a defective verdict, was set aside at the instance of the defendant, this was an express waiver, on his part, of the constitutional privilege of not being placed in jeopardy a second time for the same offense. And this is equally true whether this result is accomplished by arrest of judgment, motion for a new trial, or on a writ of error.—Cooley's Const. Lim. *328.

Under the above principles and authorities, the discharge of the defendant would be denied in any aspect of the case

[Gunter v. The State.]

contended for by appellant's counsel, either on the writ of *habeas corpus*, or on motion made in this court.

3. The court did not err in refusing to allow the defendant, on cross-examination of the witness Taylor, and others, to ask them as to particular statements made by them in their preliminary examination before the justice of the peace. These statements had been reduced to writing and subscribed by the witnesses, as required by statute, and the depositions were in court, in the possession of the defendant's counsel, and the witnesses were not allowed to examine these writings prior to or during their interrogation as to their contents. The court will not undertake to inquire whether the purpose of such a mode of examination is to contradict and impeach the witness, or to test, or even refresh his memory. The settled rule is, that the writing itself must first be shown to the witness.—1 Greenl. Ev. (14th Ed.), §§ 88, 463, 465; Best's Principles of Ev. (Cham. Ed.), § 473, p. 449. This rule was considered as so well settled by the rules of the common law in England, since the opinion of the judges in *Queen Caroline's case*, 2 Brod. & Bing. 287, in 1820, that a special act of parliament was deemed necessary, in the year 1854, in order to repeal it. The Common Law Procedure Act of that year accordingly provided, that "a witness *may* be cross-examined as to previous statements made by him in writing, or reduced into writing, relative to the subject matter of the cause, *without* such writing being shown to him; but, if it is intended to contradict such witness by the writing, his attention must, before such contradictory proof can be given, be called to those parts of the writing which are to be used for the purpose of so contradicting him."—17 & 18 Vict. c. 125, § 24; 1 Whart. Ev. (2d Ed.), §§ 68, 531; Stephen's Dig. Laws Ev., Art. 132, note. In *Floyd v. State*, 82 Ala. 16, the general rule above stated was applied to the deposition of a witness reduced to writing on a preliminary examination before a magistrate, and the principle there settled is broad enough to cover this case. We see no error, we repeat, in the rulings on this point.—*Gaffney v. People*, 50 N. Y., 416, 423; *People v. Donovan*, 43 Cal. 162.

4. The evidence in this case bearing on the alleged insanity of the defendant was conflicting, both as to the facts in proof and the opinions of experts touching the condition of the defendant's mind at the time of the homicide. In this condition of the evidence the questions propounded to Dr. Gaston, one of the witnesses for the defendant, were clearly

[Gunter v. The State.]

inadmissible, and were properly excluded by the court. The effect of these questions was to elicit the witness' opinion, not upon a similar case hypothetically stated and based on the evidence in the case, which was allowable, but upon the actual case on trial, with all its conflicting evidence, thus substituting the expert in place of the jury, to usurp their functions by determining the credibility of the witnesses, and the weight of the evidence, and thus virtually to decide upon the question of the guilt or innocence of the accused as to the specific charge in controversy. This he could not be permitted to do under the guise of an opinion.—*Page v. State*, 61 Ala. 16; Whart. Crim. Ev. § 418; 1 Greenl. Ev. (14th Ed.), § 440; Buswell on Insanity, §§ 157, 262; *Bennett v. State*, 46 Amer. Rep. 26.

5. The first and second charges requested by the defendant, in effect, involve the proposition that, although the law requires the fact of the prisoner's insanity, when interposed as a defense in a criminal case, to be proved to the satisfaction of the jury by a preponderance of the evidence, and that a reasonable doubt of the prisoner's sanity, though raised by all the evidence, does not authorize an acquittal, yet the same measure of proof can not be required as to the causal connection between the fact of insanity and the crime charged. These charges, in our opinion, were properly refused by the court. The fact of partial insanity, particularly when delusional, is no defense to a crime unless the alleged criminal act is so connected with the disease, in the relation of cause and effect, as to have been the product or outgrowth of it.—*Parsons v. State*, 81 Ala. 577. It would avail a defendant nothing, on a charge for the arson of his neighbor's dwelling, only to prove that he labored under an insane delusion that he was the son of a prince; or on a charge of burglary, that one side of his body was heavier than another; or, in fine, of murder, that he was afflicted with a delusion that he had reached the age of Methuselah. The defense set up then is the existence of a diseased mind—by which we of course mean a diseased *brain* affecting the mind—which caused or produced the perpetration of the crime, and had some sort of causal connection with it. In other words, it is not mere insanity, but that insanity which produced a given act. We do not see how it would be practicable to dissociate these two elements of fact, which taken together constitute the defense of insanity, so as to require one measure of proof for one part, and another measure for the other

part. Such an attempt would lead to interminable confusion in the administration of justice in cases of this kind. It would so destroy the simplicity of the rule as to place its practical application in the courts beyond the clear comprehension of the average juror. The rule exacting this measure of proof, we may add, is not based alone on the presumption of the defendant's sanity, in the first instance, but also upon the further fact, based upon the teachings of experience, that "criminals oftentake refuge in attempting the simulation of insanity under circumstances most difficult of detection." *Ford's case*, 71 Ala. 385, 394; *Boswell's case*, 63 Ala. 307; s. c., 35 Amer. Rep. 20.

6. The third and sixth charges relate to the testimony of Dr. Bryce, which was rendered by him as an expert in the treatment of the insane and the knowledge of the disease of insanity, based upon certain assumed hypothetical facts, similar to those arising under the evidence. The only difference between the facts in the hypothetical case and the facts proved on the trial, was in reference to the time when the alleged insane delusions of defendant first manifested their appearance. In the one, they were assumed to have appeared some weeks after the homicide, as shown on a preliminary investigation; and in the other, on the day thereafter. The charges instruct the jury as to the degree of weight which the jury were required to give this expert opinion, asserting that, in view of this difference, it was entitled to but little weight. As it lay within the province of the jury to decide whether the variance was so material, under all the facts of the case, as to have any influence or weight upon their own minds, in determining whether the accused was irresponsibly insane at the time of the killing, it is manifest that the charges were properly refused. How much weight, whether little or great, is to be accorded to evidence legally admitted, is a question going to its sufficiency, and is one purely for the jury, not the court, except in cases where the general affirmative charge is authorized.

7. The fourth and fifth charges were liable to mislead the jury under the facts in evidence. The phrases "fit of mania" and "insane delusion" are terms of ambiguous import, just as the generic term *insanity*, as used in the law books, itself is. This word embraces every species of mental unsoundness, whatever may be its source, or cause, and includes not only that derangement of the mind, produced by diseases of the brain, that is recognized by law as a defense to

crime, which is the sole product of it, but it also embraces, as said by a recent writer on the subject of insanity, "that condition of subverted reason which may be produced by intoxication." Buswell on Insanity, § 446. Lord Coke, in defining the four classes of persons *non compos*, embraces not only idiots and lunatics, and those who have lost their mind and memory by the visitation of God, but him also who has become such "by his own act, as *a drunkard*." *Beverly's case*, 4 Co. 124. This was called voluntary madness by the ancient writers. Of course we do not mean to intimate that the disease of insanity, such as may exculpate from criminal responsibility, may not result from habits of intoxication, in the form of *delirium tremens, mania a potu*, or other like chronic disorders produced from an excessive and protracted use of alcoholic stimulants, which are not the immediate but the remote or secondary consequence of such indulgence. What we do say is, that there is a species of insanity, or mental unsoundness, manifested by a temporary depression, or aberration of the mind, which sometimes accompanies or follows intoxication, and is often accompanied by delusions, hallucinations and illusions. This state of transient departure from mental soundness, is sometimes called a fit of mania, just as anger itself is often said to be a short madness, and these delusions are said to be insane delusions. But they are not such insanity as confers legal irresponsibility for crime. Dr. Bryce, in his testimony on the trial, called attention to the difference between these two classes of mania, and of delusions, the one being shown to be "a more or less prolonged departure from a man's normal or customary habits of thought, feeling and action, caused by disease of the brain;" and the other, a mere "temporary or transient departure from a state of mental health, which is due to other causes than disease, which may not amount to, and could not properly be called insanity." These, he testifies, may be produced by excess in alcoholic potations, and a consequent deteriorated state of the nervous system. He also asserts, what may be considered as the settled doctrine of this court, that none of these mental disorders can be regarded as evidence of insanity proper, "unless they are caused by, or result from *disease, or lesion of the brain*." *Parsons' case*, 81 Ala. 577. Under the facts in this case, the charges under consideration were framed in such language as rendered them peculiarly liable to mislead the jury, by inducing them to believe that delusions, immediately

[The State v. Agee.]

resulting from intoxication, might be regarded as such *insane* delusions as would constitute a sufficient excuse for homicide, where the killing was done under their influence; or that a transient fit of mania produced by *drunkenness* would constitute such insanity as confers irresponsibility for the commission of crime.

The last two charges, besides being obnoxious on the grounds above stated, were clearly in conflict with the rules laid down in *Parsons' case,* 81 Ala. 597 and 599, *supra.*

After a most careful examination of the record, and of the able and elaborate arguments of counsel in this case, we are constrained to say, that we discover no error in the rulings or judgment of the court. The application of the prisoner for the writ of *habeas corpus* must be denied; and the judgment of conviction must also be

Affirmed.